## Case No. 15,968.

### UNITED STATES v. OPEN BOAT.

·[5 Mason, .232.] [1]

Circuit Court, D. Maine. May Term, 1829.

NONINTERCOURSE LAWS—BRITISH COLONIES—OPEN BOATS—FORFEITURE OF CARGO—BURDEN OF PROOF—PRACTICE.

1. Under the act of May 15, 1820, c. 122 [3 Stat. 602]. prohibiting commercial intercourse from the British colonies in British ships, British owned vessels are included in the prohibition, although not registered or navigated according to the British navigation and registry acts.

2. But open boats, without decks, are not included in the prohibition.

3. The forfeiture, under the act, attaches to the cargo on board at the time the vessel enters, or attempts to enter our ports; and not to any cargo subsequently taken on board, though on board at the time of the seizure.

4. Where goods are seized, and claimed as forfeited as part of the cargo, the onus probandi is on the government to prove, that such goods were part of the cargo on board at the time of the offence.

5. The claimant may file a special defence on that point, if he chooses; but it is also in issue on the general denial of the allegations of the libel.

[Appeal from the district court of the United States for the district of Maine.]

Libel of seizure against an open boat and her lading, seized in fact at Eastport on navigable waters for a violation of the laws

---

of the United States, on the 4th of January, 1828, by the collector of the district of Passamaquoddy. At the trial in the district court, a decree of condemnation was pronounced against the boat and all her lading, except 7 barrels of flour, 2 barrels of pork, and 13 bags of meal, for default of any claim. [Case unreported.] The excepted goods were claimed by Bucknam and Gunnison of Eastport; and upon a subsequent hearing a decree of acquittal passed by consent in favour of the claimants; from which decree an appeal was taken in behalf of the United States to the circuit court.

Mr. Shepley, U. S. Dist. Atty.
Mr. Daveis, for claimants.

STORY, Circuit Justice. The present libel contains two counts. The first is founded upon the revenue collection act of 1799, c. 128, § 92 [1 Story's Laws, 656; 1 Stat. 697, c. 22], which declares, that "no goods &c. of foreign growth or manufacture, subject to the payment of duties, shall be brought into the United States from any foreign port or place, in any other manner than by sea, nor in any ship or vessel of less than thirty tons burthen," &c. with certain exceptions, which do not apply to the present case. The count alleges, that sundry foreign goods &c. were imported from a foreign port in this boat, the same being less than thirty tons burthen, against the form of the statute, &c. This count has been abandoned for want of evidence to support it, and may therefore be put entirely out of the case. The second count is founded on the act of May 15, 1820, c. 122 [3 Stat. 602], prohibiting commercial intercourse with the British colonies. That act declares, that "the ports of the United States shall be and remain closed against every vessel owned wholly or in part by subjects or a subject of his Britannic majesty coming or arriving by sea from any port or place in the province of Lower Canada, or coming or arriving from any port or place in the province of New Brunswick, the province of Nova Scotia, &c. And every such vessel so excluded from the ports of the United States, that shall enter or attempt to enter the same in violation of this act, shall, with her tackle, apparel, and furniture, together with the cargo on board such vessel, be forfeited to the United States." The second count alleges, that the boat is British owned, came and arrived by sea from some port or place in the province of New Brunswick, within the port of Lubec; and entered the same port, and was employed in trade between said foreign port or place and the United States, contrary to the form of the statute. The facts admitted to be true are, that the boat is an open boat, with a fore-cuddy, of six or seven tons burthen. She is owned by British subjects, and belongs to a place called La Tete, in the province of New Brunswick, and

came from thence in ballast to Eastport, where she took on board a cargo of American growth and origin, for the purpose of carrying the same to the river Maguagadavie in the same province. After her cargo was on board and before sailing, she was seized by the collector for an asserted violation of the laws of the United States.

Before I proceed to the main question, it may be well to dispose of those, which have been discussed at the bar, as in some sort of a preliminary nature.

The first question is, whether the goods now claimed are liable to forfeiture at all, it not being established by any direct proof in the cause, that they constituted any part of the cargo of the boat. This point was not made in the court below, and now comes by surprize upon the government. Under such circumstances, if the cause turned upon it, I should have no difficulty in postponing a final decision until an opportunity was given to bring this matter of fact before the court. The district attorney supposes, that enough appears upon the record to raise a presumption, that these goods were part of the cargo of the boat, especially as the claim does not set up any such special defence. The claim is, indeed, in a very general form, and quite too general and imperfect to found an exact denial of the allegations of the libel, if legal nicety had been insisted upon in the earlier proceedings. It was, without doubt, competent for the claimants to have taken the present objection by a special answer, or exception, if they had chosen so to do. But if their claim and answer contain a general denial of all the matters in the libel, every fact alleged in the libel and necessary to maintain the asserted forfeiture, must be affirmatively established by the government; for the case does not fall within the 71st section of the revenue collection act of 1799, c. 128 [1 Story's Laws, 633, 1 Stat. 678, c. 22]. Now it is very clear, that upon the language of the act of 1820, no goods are forfeited, unless they are part of the cargo on board the vessel; and consequently that fact must be affirmatively established by the United States. I see no sufficient proof to this effect on the record; and there is some presumption against it; for the boat, on board of which these goods were laden, is said to have been given up by the collector; and the boat, to which the present libel attaches, has been condemned and sold under the process of the court. So that (to say the least of it) there is sufficient doubt to call for some farther proof and explanation.

A more material question is, what is the true construction of the act of 1820, as to the cargo liable to condemnation? Is it the cargo on board at the time of committing the offense, that is to say, at the time of the illegal entry, or attempt to enter; or the cargo on board at the time of the seizure, however long afterwards that may be

made? The latter construction is insisted on by the district attorney; and the former is contended for on the other side. My opinion is, that the cargo intended by the act is the cargo on board at the time, when the vessel enters, or attempts to enter the port. The words are, "every such vessel, &c. that shall enter or attempt to enter, &c. shall, with her tackle, &c. together with the cargo on board such vessel, be forfeited." The offence is committed, and the forfeiture is complete at the moment of the entry, or the attempt to enter. If she has no cargo then on board, none is subjected to forfeiture; for the words of the act do not look to any future events to impose a new forfeiture. The cargo affected with forfeiture is deemed in some sort a participator in the offence, and involved in the guilt of the vehicle. If the legislature had intended to subject every future cargo taken on board by the vessel to forfeiture, as tainted by association with the offending vessel, the natural language would have been, that every such vessel, together with the cargo found on board at the time of seizure, although not on board at the time of the offence, shall be forfeited. But the language used is different, and just such as must have been used, if the cargo to be forfeited was to be on board contemporary with the offence. It is difficult to read it, and not to perceive, that the vessel, her tackle, &c. and her cargo on board, are to be affected with the forfeiture at the same instant of time. The effect of a different construction would be to create a sort of floating, and fluctuating forfeiture, attaching to different things at different times. Thus, if various cargoes were put on board at subsequent periods between the time of the offence and the seizure, one of two things must happen; either, that the forfeiture would attach to each successive cargo taken on board, and thus be cumulative on all; or that the cargo found on board, though innocent, would be subjected to the offence, and discharge every antecedent cargo from it. The original cargo on board at the time of the offence might in this way escape, although embraced in the corpus delicti; and an entirely innocent cargo, belonging to persons in utter ignorance of it, become the victim. The forfeiture would thus be in suspense until the moment of seizure, and depend, not upon association in crime, but upon the choice, or caprice, or diligence of the seizing officer, as to the time of seizure. I do not say, that such a course of legislation might not exist; and if it did, the court would be bound to act upon it. But it would be so extraordinary and unprecedented, so dissonant from the principles of general justice and convenience, and so subversive of private security and private rights, that it would require very strong and direct expressions on the part of the legislature to justify such an interpretation of its acts.

The case of The Two Friends [Case No. 14,289], has been cited by the district attorney in favour of his construction of the statute. If I could view that case in the same light, it would very much abate my confidence in that decision on the particular point, for which it is now cited; although it would still be maintainable upon the other grounds stated in the opinion of the court. But I am of opinion, that nothing in that case touches the present in point of principle. That was the case of a coasting vessel, which was seized, while she was engaged in the coasting trade under a coasting license, regularly granted. The material objections against her were, that during the time the license was in force she was transferred to a British subject, and that she was engaged in a trade, for which she was not licensed. The 32d section of the coasting act of 1793, c. 52 [1 Story's Laws, 298; 1 Stat. 316], (c. 8), declares, that if any licensed ship or vessel shall be transferred in whole or in part, to any person, who is not at the time of such transfer a citizen of or resident within the United States, or if such ship or vessel shall be employed in any other trade than that, for which she is licensed, or shall be found with a forged or altered license, or one granted for any other ship or vessel, every such ship or vessel, with her tackle, &c. and the cargo found on board her, shall be forfeited. The court held, that the cargo found on board at the time of the seizure was forfeited. But that decision proceeded upon the ground of the peculiar language of the act, and the consideration, that the forfeiture was a continuing forfeiture by the vessel's still sailing and acting illegally under the license up to the very time of the seizure. If the vessel had ceased to be engaged in the coasting trade, and had afterwards taken an innocent cargo on board, there is nothing in that opinion, which decides, that such a cargo, under such circumstances would have been forfeited. And here I might stop. But I am given to understand, that the important question, which the parties wish to have settled, and which was the main object of the present appeal, is, whether a boat of the description of that under seizure, owned by British subjects, resident in a British province, is within the prohibitions of the act of 1820. The point has been fully argued in the present case, as well as in a former case before this court; and as all parties press for a decision upon it, and it is of great interest to the inhabitants of Maine bordering on the British provinces, the court will not decline to express its opinion. The true answer depends upon the point, whether an open boat, owned by a British subject, is a vessel within the meaning of the act of 1820. In the case of U. S. v. An Open Boat [Case No. 15,967], Noyes, claimant, decided at the last October term, at Wiscasset, the point was much discussed; and the reasoning of the court led to the conclusion (though

there was no absolute decision) that an open boat, without decks or masts, was not a "vessel" within the purview of the statute, because in a nautical sense, as well as in the sense of our revenue and navigation laws, the term "vessel" is used in contradistinction to such boats, to indicate a class of larger sized shipping. I do not go over the illustrations used on that occasion, because the case is already before the public; but I advert to it simply to state, that further reflection has induced me to adhere to that opinion. The boat now before the court could not be lawfully employed in any trade from the province of New Brunswick to the United States, with goods of foreign growth or manufacture; because such trade is prohibited by the act of 1799, c. 128, § 92 [1 Story's Laws, 656; 1 Stat. 697, c. 22], to vessels of less than thirty tons. She was not in fact so employed. Unless she was prohibited from an entry into our ports, the subsequent act of receiving a cargo on board of American growth for a return voyage to New Brunswick constituted no offence. The words of the act of 1820 do not, in my judgment, prohibit such an entry, or such an exportation. This court is not at liberty to look beyond the words of the act for the policy, which governed its provisions. The words must be construed according to their natural import, taken in connexion with other statutes for the regulation of commerce. It is a well known rule, that penal statutes are construed strictly; and that forfeitures are not to be inflicted by straining the words so as to reach some conjectural policy, not avowed on the face of the statute. Even where cases lie within the same mischief, if they are not provided for in the text of the act, courts of justice do not adventure on the usurpation of legislative authority to meet them. I must confess too, that if I were at liberty to travel out of the words of the act, and consult any supposed public policy of the government, there is no clear ground, upon which I could affirm, that boats of this description were intended by the government to be excluded from our ports, or were prohibited from carrying goods from our ports to the British colonies.

One argument, much pressed by the counsel for the claimants in the former, as well as in the present case, requires to be noticed. It is, that no British owned vessels are within the act of 1820, except such as are British owned and navigated in the sense of the British navigation and registry acts. It is said, and said truly, that this court, sitting in admiralty, may take notice of these acts; and that the very terms of our prohibitory and retaliatory acts invite the court to such an examination, by the references, which are tacitly made to the British system. But, giving whatever force we may to this line of argument, it must still be conceded, that our own acts must be construed by their own words: and that though the causes of our

prohibitory system may be found in the corresponding British legislation, yet it by no means follows, that congress was bound to stop, where that stopped; or intended to confine its own enactments to the existing state of the British shipping laws. The court then is not called upon to impose any limitation upon the words of the act of 1820, which they do not of themselves import. The words are "every vessel owned, wholly or in part, by a subject or subjects of his Britannic majesty." Now, a vessel may fall within this category, although she is not registered or navigated according to the British acts, so as to entitle her to the statute benefits of a British character. British ownership is one thing; a title to the benefits of the British navigation acts is quite another thing. A different construction would make our own legislation dependant on the state of the British laws at every moment; and a slight relaxation of them in favour of her own colonial navigation would at once defeat our whole system, and reduce it to a dead letter. What authority has this court to presume, that so obvious a result was not within the scope of the legislation of congress, and intentionally provided for? The words of the act of 1820 cover such a case; and how can this court say, that they are to be narrowed down, so as to be inoperative, where they would be most needed, in cases within the same mischief, and justifying the same retaliation? My opinion is, that every vessel owned by British subjects, domiciled in the British dominions, is within the intent of the act; and that though our retaliatory system looked to the state of the British laws, it meant to meet them, not in their form, but in their principle, however that might be varied.

Upon the whole my opinion is, that the decree of the district court must be affirmed; but I shall certify that there was reasonable cause of seizure. Decree accordingly.