3/8/2022 9:20:39 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **20-5279.pdf** | versus | **20-5279_new.pdf** |
| **43 pages (225 KB)** | | **43 pages (225 KB)** |
| 3/4/2022 5:36:55 PM | | 3/8/2022 9:19:53 AM |

**Total Changes**

**1**

**Content**

1 Replacement

0 Insertions

0 Deletions

**Styling and Annotations**

0 Styling

0 Annotations

Go to First Change (page 7)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WOODEN *v*. UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 20–5279. Argued October 4, 2021—Decided March 7, 2022

A jury convicted William Dale Wooden of being a felon in possession of a firearm in violation of 18 U. S. C. §922(g). The Government asked the District Court to sentence Wooden under the Armed Career Criminal Act (ACCA). ACCA mandates a 15-year minimum penalty for §922(g) offenders with at least three prior convictions for specified felonies "committed on occasions different from one another." §924(e)(1). Wooden's relevant criminal record included ten burglary convictions arising out of a single criminal episode in 1997, during which Wooden had unlawfully entered a one-building storage facility and stolen items from ten different storage units. Prosecutors indicted Wooden on ten counts of burglary—one for each storage unit—and Wooden pleaded guilty to all counts. Years later, at Wooden's sentencing hearing on his §922(g) conviction, the District Court applied ACCA's penalty enhancement in accordance with the Government's view that Wooden had commenced a new "occasion" of criminal activity each time he left one storage unit and entered another. The resulting sentence was almost sixteen years, much higher than the statutory maximum for Wooden's crime absent such an enhancement. The Sixth Circuit affirmed, reasoning that ACCA's occasions clause is satisfied whenever crimes take place at different moments in time—that is, sequentially rather than simultaneously.

*Held*: Wooden's ten burglary offenses arising from a single criminal episode did not occur on different "occasions" and thus count as only one prior conviction for purposes of ACCA. Pp. 4–15.

  (a) Wooden's successive burglaries occurred on one "occasion" under a natural construction of that term. An ordinary person using language in its normal way would describe Wooden's entries into the stor-

age units as happening on a single occasion, rather than on ten "occasions different from one another." §924(e)(1). The Government's contention that an "occasion" ends at the discrete moment when an offense's elements are established contravenes the ordinary usage of the word. An occasion may itself encompass multiple, temporally distinct activities. For example, the occasion of a wedding may include a ceremony, cocktail hour, dinner, and dancing. Those activities need not—and often do not—occur simultaneously; yet they nevertheless compose one occasion. The same is true for sequential criminal offenses. Indeed, the Court has often used the word "occasion" to encompass multiple, temporally discrete offenses. See, *e.g., United States* v. *Bryant*, 579 U. S. 140, 151. The Government's contrary view—that each sequential offense forms its own "occasion"—can make someone a career offender in the space of a minute. But that view goes far toward collapsing ACCA's two separate statutory conditions for imposing an enhanced penalty on a §922(g) offender. ACCA's enhancement kicks in only if (1) the offender has three previous convictions for specified felonies; and (2) those predicate felonies were committed on "occasions different from one another." §924(e)(1). The Government's approach would largely collapse the two conditions and give ACCA's three-occasions requirement no work to do. Pp. 5–7.

(b) Given what "occasion" ordinarily means, whether criminal activities occurred on one occasion or different occasions requires a multifactored inquiry that may depend on a range of circumstances, including timing, location, and the character and relationship of the offenses. For the most part, the determination will be straightforward and intuitive. In many cases, a single factor—especially of time or place—can decisively differentiate occasions. In hard cases, the inquiry may involve keeping an eye on ACCA's history and purpose. Here, every relevant consideration shows that Wooden burglarized ten storage units on a single occasion. Indeed it was because the burglaries "ar[ose] from the same conduct" that Georgia law required the prosecutor to charge all ten in a single indictment. Ga. Code Ann. §16–1–7(b). Pp. 8–9.

(c) Statutory history and purpose confirm the Court's view of the occasions clause's meaning, as well as the Court's conclusion that Wooden is not a career offender. Congress added the occasions clause only after a court applied ACCA's enhancement to Samuel Petty—an offender who, much like Wooden, was convicted of multiple counts of robbery for one night in one restaurant. See *United States* v. *Petty*, 798 F. 2d 1157. Petty sought review in this Court, and the Solicitor General confessed error, stating that ACCA should not be construed to reach multiple felony convictions arising out of a single criminal episode. Shortly thereafter, Congress amended ACCA to require that the

requisite offenses occur on "occasions different from one another." Minor and Technical Criminal Law Amendments Act of 1988, §7056, 102 Stat. 4402. That statutory change, rejecting the original outcome in *Petty* in light of the Solicitor General's confession of error, is at odds with the Government's current view of the occasions clause. The Government attempts to distinguish the facts of *Petty*, but nothing about the Solicitor General's confession of error, or Congress's amendment of ACCA, suggests any concern for whether an offender's crimes were committed simultaneously or sequentially. Instead, each was based on another idea—that a person who has robbed a restaurant, and done nothing else, is not a career offender. The history of the occasions clause thus aligns with what this Court has always recognized as ACCA's purpose: to address the "special danger" posed by the eponymous "armed career criminal." *Begay* v. *United States*, 553 U. S. 137, 146. Wooden's burglary of a single storage facility does not suggest that kind of danger, any more than Petty's robbery of a single restaurant did. Pp. 10–14.

945 F. 3d 498, reversed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, SOTOMAYOR, and KAVANAUGH, JJ., joined, and in which THOMAS, ALITO, and BARRETT, JJ., joined as to all but Part II–B. SOTOMAYOR, J., filed a concurring opinion. KAVANAUGH, J., filed a concurring opinion. BARRETT, J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined. GORSUCH, J., filed an opinion concurring in the judgment, in which SOTOMAYOR, J., joined as to Parts II, III, and IV.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–5279

WILLIAM DALE WOODEN, PETITIONER
*v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[March 7, 2022]

JUSTICE KAGAN delivered the opinion of the Court.

In the course of one evening, William Dale Wooden burglarized ten units in a single storage facility. He later pleaded guilty, for that night's work, to ten counts of burglary—one for each storage unit he had entered. Some two decades later, the courts below concluded that those convictions were enough to subject Wooden to enhanced criminal penalties under the Armed Career Criminal Act (ACCA). That statute mandates a 15-year minimum sentence for unlawful gun possession when the offender has three or more prior convictions for violent felonies like burglary "committed on occasions different from one another." 18 U. S. C. §924(e)(1). The question presented is whether Wooden's prior convictions were for offenses occurring on different occasions, as the lower courts held, because the burglary of each unit happened at a distinct point in time, rather than simultaneously. The answer is no. Convictions arising from a single criminal episode, in the way Wooden's did, can count only once under ACCA.

## I

Begin in 1997, when Wooden and three confederates un-lawfully entered a one-building storage facility at 100 Wil-liams Road in Dalton, Georgia, next door to Wooden's home. The burglars proceeded from unit to unit within the facility, "crushing the interior drywall" between them. App. 32 (in-dictment); see Addendum to Brief for Petitioner 6a (state-ment of Assistant District Attorney at plea hearing) ("[O]nce they made entry" into the facility, they "burrowed through from . . . unit to unit"). The men stole items from, all told, ten different storage units. So Georgia prosecutors charged them with ten counts of burglary—though, as state law prescribes, in a single indictment. See Ga. Code Ann. §16–1–7(b) (1996) (requiring "crimes arising from the same conduct" to be prosecuted together). Wooden pleaded guilty to all counts. The judge sentenced him to eight years' im-prisonment for each conviction, with the ten terms to run concurrently.

Fast forward now to a cold November morning in 2014, when Wooden responded to a police officer's knock on his door. The officer asked to speak with Wooden's wife. And noting the chill in the air, the officer asked if he could step inside, to stay warm. Wooden agreed. But his good deed did not go unpunished. Once admitted to the house, the officer spotted several guns. Knowing that Wooden was a felon, the officer placed him under arrest. A jury later con-victed him for being a felon in possession of a firearm, in violation of 18 U. S. C. §922(g).

The penalty for that crime varies significantly depending on whether ACCA applies. Putting ACCA aside, the *maxi-mum* sentence for violating §922(g) is ten years in prison. See §924(a)(2). But ACCA mandates a *minimum* sentence of fifteen years if the §922(g) offender has three prior con-victions for "violent felon[ies]" (like burglary) or "serious drug offense[s]" that were "committed on occasions differ-ent from one another." §924(e)(1). In Wooden's own case,

the record reveals the discrepancy as especially stark. Before the Government decided to seek an ACCA enhancement, its Probation Office recommended a sentence of 21 to 27 months. See App. 38–39, 42. The ACCA minimum sentence is about 13 years longer.

The District Court's sentencing hearing focused on whether Wooden's ten convictions for breaking into the storage facility sufficed to trigger ACCA. Wooden said they did not because he had burglarized the ten storage units on a single occasion, rather than "on occasions different from one another." §924(e)(1). The burglaries, he explained, happened "during the same criminal episode," "at the same business location, under the same roof." App. 50. And given those facts, he continued, the burglaries were "charged in a single indictment." *Ibid.* But the District Court accepted the Government's view that every time Wooden busted into another storage unit, he commenced a new "occasion" of criminal activity. The court reasoned, relying on Circuit precedent, that the entry into "[e]ach separate [unit] provides a discrete point at which the first offense was completed and the second began and so on." *Id.*, at 59. Based on the ACCA enhancement, the court sentenced Wooden to 188 months (almost 16 years) in prison for unlawfully possessing a gun.

The Court of Appeals for the Sixth Circuit affirmed the sentence, on the same reasoning. "[I]t is possible," the court stated, "to discern the point at which Wooden's first offense" was "completed and the subsequent point at which his second offense began." 945 F. 3d 498, 505 (2019). After all, "Wooden could not be in two (let alone ten) of [the storage units] at once." *Ibid.* In the court's view, the sequential nature of Wooden's crimes—his progression from one unit in the storage facility to the next to the next—meant that the crimes were "committed on occasions different from one another." And so, the court concluded, Wooden qualified as a career offender under ACCA.

Opinion of the Court

The Courts of Appeals have divided over the meaning of ACCA's "occasions" clause. Some Circuits, like the Sixth, deem the clause satisfied whenever crimes take place at different moments in time—that is, sequentially rather than simultaneously.[1] Other Circuits undertake a more holistic inquiry, considering not merely the precise timing but also other circumstances of the crimes.[2] We granted certiorari, 592 U. S. ___ (2021), to resolve that split of authority.[3]

## II

Framed in terms of this case, the disputed question is whether Wooden committed his crimes on a single occasion or on ten separate ones.

The Government answers ten, relying on a legally fancified version of the Sixth Circuit's timing test. In the ACCA context, the Government argues, an "occasion" happens "at a particular point in time"—the moment "when [an offense's] elements are established." Brief for United States 9. So offenses "occur on different 'occasions' when the criminal conduct necessary to satisfy the offense elements occurs at different times." *Id.*, at 13. Applying that elements-based, "temporal-distinctness test" to this case, the Government explains that Wooden's burglaries were "quintessentially sequential, rather than simultaneous." *Id.*, at 10, 20. After all, a person can satisfy the elements of burglary only

––––––––––

[1] See, *e.g.*, *United States* v. *Carter*, 969 F. 3d 1239, 1243 (CA11 2020); *United States* v. *Morris*, 821 F. 3d 877, 880 (CA7 2016); *United States* v. *Abbott*, 794 F.3d 896, 898 (CA8 2015) (*per curiam*); *United States* v. *Fuller*, 453 F.3d 274, 278–279 (CA5 2006).

[2] See, *e.g.*, *United States* v. *Bordeaux*, 886 F. 3d 189, 196 (CA2 2018); *United States* v. *Stearns*, 387 F. 3d 104, 108 (CA1 2004).

[3] Two *amici curiae* have briefed another question arising from ACCA's occasions clause: whether the Sixth Amendment requires that a jury, rather than a judge, resolve whether prior crimes occurred on a single occasion. See Brief for National Association of Criminal Defense Lawyers 13–19; Brief for National Association of Federal Defenders 21–32. We do not address that issue because Wooden did not raise it.

by entering (or remaining in) a structure with criminal intent. See, *e.g.*, Ga. Code Ann. §16–7–1(a). And it would have been "physically impossible" for Wooden to have entered (or remained in) multiple storage units "at once." Brief for United States 12. Each of Wooden's ten entries thus counts (so says the Government) as another "occasion," triggering ACCA's stringent penalties more than three times over.

We think not. The ordinary meaning of the word "occasion"—essentially an episode or event—refutes the Government's single-minded focus on whether a crime's elements were established at a discrete moment in time. And ACCA's history and purpose do so too: The origin of the "occasions" clause confirms that multiple crimes may occur on one occasion even if not at the same moment. Wooden's night of crime is a perfect case in point. His one-after-another-after-another burglary of ten units in a single storage facility occurred on one "occasion," under a natural construction of that term and consistent with the reason it became part of ACCA.

A

Consider first how an ordinary person (a reporter; a police officer; yes, even a lawyer) might describe Wooden's ten burglaries—and how she would not. The observer might say: "On one occasion, Wooden burglarized ten units in a storage facility." By contrast, she would never say: "On ten occasions, Wooden burglarized a unit in the facility." Nor would she say anything like: "On one occasion, Wooden burglarized a storage unit; on a second occasion, he burglarized another unit; on a third occasion, he burglarized yet another; and so on." She would, using language in its normal way, group his entries into the storage units, even though not simultaneous, all together—as happening on a single occasion, rather than on ten "occasions different from one another." §924(e)(1).

That usage fits the ordinary meaning of "occasion." The word commonly refers to an event, occurrence, happening, or episode. See, *e.g.*, American Heritage Dictionary 908 (1981); Webster's Third New International Dictionary 1560 (3d ed. 1986). And such an event, occurrence, happening, or episode—which is simply to say, such an occasion—may itself encompass multiple, temporally distinct activities. The occasion of a wedding, for example, often includes a ceremony, cocktail hour, dinner, and dancing. Those doings are proximate in time and place, and have a shared theme (celebrating the happy couple); their connections are, indeed, what makes them part of a single event. But they do not occur at the same moment: The newlyweds would surely take offense if a guest organized a conga line in the middle of their vows. That is because an occasion may—and the hypothesized one does—encompass a number of non-simultaneous activities; it need not be confined to a single one.

The same is true (to shift gears from the felicitous to the felonious) when it comes to crime. In that sphere too, an "occasion" means an event or episode—which may, in common usage, include temporally discrete offenses. Consider a couple of descriptions from this Court's cases. "On one occasion," we noted, "Bryant hit his live-in girlfriend on the head with a beer bottle and attempted to strangle her." *United States* v. *Bryant*, 579 U. S. 140, 151 (2016). *"On one occasion"*—regardless whether those acts occurred at once (as the Government would require) or instead succeeded one another. *Ibid.* Likewise, we said: "[T]he State has stipulated that the robbery and murder arose out of 'the same set of facts, circumstances, and the same occasion.'" *Turner* v. *Arkansas*, 407 U. S. 366, 368–369 (1972) (*per curiam*). *"[T]he same occasion"*—irrespective whether the murder took place during (as the Government insists on) or instead just after the robbery. *Ibid.* Or take a hypothetical suggested by oral argument here: A barroom brawl breaks out, and a patron hits first one, then another, and then a third

of his fellow drinkers. The Government maintains those are not just three offenses (assaults) but also three "occasions" because they happened seriatim. See Tr. of Oral Arg. 52–53, 61–62. But in making the leap from three offenses to three occasions, based on a split-second separation between punches, the Government leaves ordinary language behind. The occasion in the hypothetical is the barroom brawl, not each individual fisticuff.

By treating each temporally distinct offense as its own occasion, the Government goes far toward collapsing two separate statutory conditions. Recall that ACCA kicks in only if (1) a §922(g) offender has previously been convicted of three violent felonies, and (2) those three felonies were committed on "occasions different from one another." §924(e)(1); see *supra*, at 2. In other words, the statute contains *both* a three-offense requirement *and* a three-occasion requirement. But under the Government's view, the two will generally boil down to the same thing: When an offender's criminal history meets the three-offense demand, it will also meet the three-occasion one. That is because people seldom commit—indeed, seldom can commit—multiple ACCA offenses at the exact same time. Take burglary. It is, just as the Government argues, "physically impossible" for an offender to enter different structures simultaneously. Brief for United States 16–17; see *supra*, at 4–5. Or consider crimes defined by the use of physical force, such as assault or murder. Except in unusual cases (like a bombing), multiple offenses of that kind happen one by one by one, even if all occur in a short spell. The Government's reading, to be sure, does not render the occasions clause wholly superfluous; in select circumstances, a criminal may satisfy the elements of multiple offenses in a single instant. But for the most part, the Government's hyper-technical focus on the precise timing of elements—which can make someone a career criminal in the space of a minute—gives ACCA's three-occasions requirement no work to do.

The inquiry that requirement entails, given what "occasion" ordinarily means, is more multi-factored in nature. From the wedding to the barroom brawl, all the examples offered above suggest that a range of circumstances may be relevant to identifying episodes of criminal activity. Timing of course matters, though not in the split-second, elements-based way the Government proposes. Offenses committed close in time, in an uninterrupted course of conduct, will often count as part of one occasion; not so offenses separated by substantial gaps in time or significant intervening events. Proximity of location is also important; the further away crimes take place, the less likely they are components of the same criminal event. And the character and relationship of the offenses may make a difference: The more similar or intertwined the conduct giving rise to the offenses—the more, for example, they share a common scheme or purpose—the more apt they are to compose one occasion.

For the most part, applying this approach will be straightforward and intuitive. In the Circuits that have used it, we can find no example (nor has the Government offered one) of judges coming out differently on similar facts. In many cases, a single factor—especially of time or place—can decisively differentiate occasions. Courts, for instance, have nearly always treated offenses as occurring on separate occasions if a person committed them a day or more apart, or at a "significant distance." *United States* v. *Rideout*, 3 F. 3d 32, 35 (CA2 1993); see, *e.g.*, *United States* v. *Riddle*, 47 F. 3d 460, 462 (CA1 1995) (*per curiam*). In other cases, the inquiry just as readily shows a single occasion, because all the factors cut that way. That is true, for example, in our barroom-brawl hypothetical, where the offender has engaged in a continuous stream of closely related criminal acts at one location. Of course, there will be some hard cases in between, as under almost any legal test. When that is so, assessing the relevant circumstances may also involve keeping an eye on ACCA's history and purpose,

which we next discuss. See *infra*, at 10–14. But in law as in life, it is usually not so difficult to identify an "occasion": Given that the term in ACCA has just its ordinary meaning, most cases should involve no extra-ordinary work.

And surely, this one does not. Here, every relevant consideration shows that Wooden burglarized ten storage units on a single occasion, even though his criminal activity resulted in double-digit convictions. Wooden committed his burglaries on a single night, in a single uninterrupted course of conduct. The crimes all took place at one location, a one-building storage facility with one address. Each offense was essentially identical, and all were intertwined with the others. The burglaries were part and parcel of the same scheme, actuated by the same motive, and accomplished by the same means. Indeed, each burglary in some sense facilitated the next, as Wooden moved from unit to unit to unit, all in a row. And reflecting all these facts, Georgia law treated the burglaries as integrally connected. Because they "ar[ose] from the same conduct," the prosecutor had to charge all ten in a single indictment. Ga. Code Ann. §16–1–7(b); see *Morgan* v. *State*, 220 Ga. App. 198, 199–200, 469 S. E. 2d 340, 341–343 (1996) (holding that, under §16–1–7(b), similar drug offenses had to be charged together because they occurred "very close in time" as "part of an ongoing chain of events"); *supra*, at 2. The indictment thus confirms what all the circumstances suggest: One criminal occasion notwithstanding ten crimes.[4]

————————

[4] JUSTICE GORSUCH asserts that a multi-factor test provides too "little guidance," including in this very case. *Post*, at 2; see *post*, at 2–5 (opinion concurring in judgment). But to begin with, we did not choose the test; Congress did. By directing an inquiry into whether prior offenses were "committed on occasions different from one another," Congress required consideration of the varied factors that may define an "occasion." And while the test Congress chose will produce some hard cases, Wooden's is not one of them. The courts below reached a different conclusion in this case only because they applied a categorical rule that sequential offenses always occur on different occasions (a rule JUSTICE GORSUCH agrees has

### B

Statutory history and purpose confirm our view of the oc-
casions clause's meaning, as well as our conclusion that
Wooden is not a career offender. For the first four years of
its existence, ACCA asked only about offenses, not about
occasions. Its enhanced penalties, that is, kicked in when-
ever a §922(g) offender had three prior convictions for spec-
ified crimes—in the initial version, for robbery or burglary
alone, and in the soon-amended version, for any violent fel-
ony or serious drug offense. See Armed Career Criminal
Act of 1984, §1802, 98 Stat. 2185; Career Criminals Amend-
ment Act of 1986, §1402(a), 100 Stat. 3207–39. Congress
added the occasions clause only after a court applied ACCA
to an offender much like Wooden—a person convicted of
multiple counts of robbery arising from a single criminal
episode.

In that precipitating case, Samuel Petty received ACCA's
minimum 15-year penalty for gun possession based on his
earlier stickup of a Manhattan restaurant. Petty and three
associates had entered the establishment brandishing an
assortment of guns and ordered the patrons and employees
to the floor. See Addendum to Brief for Petitioner 11a–12a
(New York State's brief). The gunmen then made their way
around the premises, collecting money and other valuables
from the prostrate victims. See *id.*, at 12a–17a. For his role
in the crime, Petty was convicted of six counts of robbery—
one count for each of six individuals whose property had
been taken—and served concurrent 5-year sentences. See
*United States* v. *Petty*, 798 F. 2d 1157, 1159–1160 (CA8
1986). Some years later, Petty was caught possessing a
firearm and convicted of violating §922(g). Federal prose-
cutors asked for heightened penalties under ACCA, point-

———————

no basis). See *supra*, at 3; *post*, at 1–2. Once that mistake is corrected,
Wooden's case becomes an easy one.

ing to his six robbery convictions from the restaurant incident. The District Court sentenced Petty on that basis, and the Court of Appeals for the Eighth Circuit affirmed. That court held it irrelevant under ACCA that the six convictions "ar[ose] out of the same transaction." *Id.*, at 1160.

But when Petty sought this Court's review, the Solicitor General confessed error, stating that ACCA should not be construed "to reach multiple felony convictions arising out of a single criminal episode." Addendum to Brief for Petitioner 30a–31a. In taking that position—requiring the convictions to come instead from "multiple criminal episodes"—the Solicitor General could not rely on ACCA's text. *Id.*, at 26a. He acknowledged that ACCA lacked language found in other penalty-enhancement laws requiring prior crimes to have occurred on "occasions different from one another." *Id.*, at 25a–26a (quoting 18 U. S. C. §3575(e)(1) (1982 ed.); 21 U. S. C. §849(e)(1) (1982 ed.)). But in the Solicitor General's view, the legislative history showed that Congress intended ACCA to have the same scope as those other laws. The Solicitor General highlighted "references throughout the legislative reports and the floor debates to 'career criminals,' 'repeat offenders,' 'habitual offenders,' 'recidivists,' 'revolving door' offenders, [and] 'three time loser[s].'" Addendum to Brief for Petitioner 27a, and n. 6. Those references, along with the very "title of the Act—the Armed Career Criminal Act," made clear that the courts in Petty's case had read ACCA too broadly. *Id.*, at 26a (internal quotation marks omitted). According to the Solicitor General, Petty's six robbery convictions—because they arose from "a single criminal episode"—should have counted as just one. In light of that changed position, this Court remanded the case to the Court of Appeals for "further consideration." *Petty* v. *United States*, 481 U. S. 1034, 1034–1035 (1987). And this time, the Eighth Circuit found in Petty's favor. See *United States* v. *Petty*, 828 F. 2d 2, 3 (1987) (*per curiam*).

More important here, Congress amended ACCA to pre-
vent future Pettys from being sentenced as career crimi-
nals. Just one year after the Solicitor General confessed
error, Congress added the occasions clause—demanding,
exactly as in the other laws he had cited, that the requisite
prior crimes occur on "occasions different from one an-
other." Minor and Technical Criminal Law Amendments
Act of 1988, §7056, 102 Stat. 4402. In placing the amend-
ment on the Senate calendar, Senator Robert Byrd intro-
duced an analysis, on behalf of the Judiciary Committee,
setting out the genesis and purpose of the new language.
"The proposed amendment," the analysis explained, "would
clarify the armed career criminal statute to reflect the So-
licitor General's construction" in *Petty*. 134 Cong. Rec.
13783 (1988). His "interpretation plainly expresses," the
analysis continued, "what is meant by a 'career criminal,'
that is, a person who over the course of time commits three
or more of the enumerated kinds of felonies." *Ibid.* The
statement concluded that "clarify[ing] the statute in this re-
gard" would "insure that its rigorous sentencing provisions
apply only as intended in cases meriting such strict punish-
ment." *Ibid.* Congress enacted the amendment with near-
unanimous support. See 134 Cong. Rec. 24924, 30826,
32678, 33318.[5]

That statutory change, rejecting the original outcome in
*Petty* in light of the Solicitor General's confession of error,
is at odds with the Government's current view of the occa-
sions clause. After all, that view does not (as the former

---

[5] Contrary to JUSTICE BARRETT's characterization, we do not claim that
Congress ratified every jot and tittle of the Solicitor General's brief. *Post*,
at 1 (opinion concurring in part and concurring in judgment). But nei-
ther do we blind ourselves to the fact—which even the Government here
fully accepts—that Congress added the occasions clause to ACCA "in
response" to "the government's confession of error" in *Petty*. Brief for
United States 10, 24.

Solicitor General's did) demand "multiple criminal episodes" as ordinarily understood: To the contrary, it enables ACCA "to reach multiple felony convictions arising out of a single criminal episode" so long as the crimes' elements are not satisfied at once. Addendum to Brief for Petitioner 26a, 31a (confession of error); see *supra*, at 4–5, 7. To be sure, the Government proposes a way to reconcile its test with the rejection of the enhanced sentence given to Petty: The restaurant robberies, the Government says, happened on one occasion because "the defendants ordered all the victims to turn over their belongings at once, under a continuous show of force, and multiple gunmen gathered the victims' items simultaneously." Brief for United States 25. But even if that is true—the briefs and opinions in the case do not clearly say—the Government's theory makes the "how many occasions" question turn on trifles. Suppose Petty and his cohorts had proceeded without all this purported simultaneity. Suppose they had robbed everyone in the dining room first, then everyone in the kitchen. Or suppose the robbers had gone from booth to booth to booth, turning their guns on their victims in turn. The Government says that with any such "sequenc[ing]," a different result would obtain. *Ibid.*; see Tr. of Oral Arg. 52–53, 60–62. What it does not do, except in the most technical sense, is explain why. Nothing about the Solicitor General's confession of error, or the action Congress took in its wake, suggests any concern for the exact ordering of Petty's actions. Each was based instead on another idea: A person who has robbed a restaurant, and done nothing else, is not a "habitual offender[]" or "career criminal[]." Addendum to Brief for Petitioner 27a; see also 134 Cong. Rec. 13782–13783.

The history of the occasions clause thus aligns with what this Court has always recognized as ACCA's purpose. Congress enacted ACCA to address the "special danger" posed by the eponymous "armed career criminal." *Begay* v. *United States*, 553 U. S. 137, 146 (2008). The theory of the statute

is that "those who commit a large number of fairly serious crimes as their means of livelihood" are especially likely to inflict grave harm when in possession of a firearm. *Taylor* v. *United States*, 495 U. S. 575, 587–588 (1990). And so the statute targets "a particular subset of offenders"—those who have repeatedly committed violent crimes. *Begay*, 553 U. S., at 147. It was that focus on "revolving door" felons that the Solicitor General referenced in arguing that the courts in *Petty* had construed ACCA too broadly. See Addendum to Brief for Petitioner 27a, and n. 6; *supra*, at 11. And it was that focus to which Congress itself returned in adding the occasions clause—once again, "to insure that [ACCA's] rigorous sentencing provisions apply only as intended in cases meriting such strict punishment." 134 Cong. Rec. 13783; see *supra*, at 12.

Wooden's burglary of a storage facility does not create that kind of case, any more than Petty's robbery of a restaurant did. Wooden's convictions, much like Petty's, arose from a closely related set of acts occurring on the same night, at the same place—making up, just as the former Solicitor General said, "a single criminal episode." Addendum to Brief for Petitioner 31a; see *supra*, at 11. Wooden did not become a career criminal when he moved from the second storage unit to the third, as Petty did not when he moved from the second to the third of the restaurant's patrons. Wooden and Petty both served significant sentences for their crimes, and rightly so. But in enacting the occasions clause, Congress made certain that crimes like theirs, taken alone, would not subject a person to a 15-year minimum sentence for illegally possessing a gun.

## III

For the reasons stated, Wooden's ten burglary convictions were for offenses committed on a single occasion. They therefore count only once under ACCA. We reverse the

judgment of the Sixth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 20–5279

WILLIAM DALE WOODEN, PETITIONER
*v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[March 7, 2022]

JUSTICE SOTOMAYOR, concurring.

I join the opinion of the Court because on the facts of this case, it is clear that Wooden's prior convictions did not take place "on occasions different from one another," as required for the sentencing enhancement to apply. 18 U. S. C. §924(e)(1). JUSTICE GORSUCH raises questions about the clarity of the record below, but in my view, those questions only underscore the Government's failure to carry its burden of proving the enhancement's application. See *Pereida* v. *Wilkinson*, 592 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 14) (citing *Johnson* v. *United States*, 559 U. S. 133, 137 (2010)). I agree with JUSTICE GORSUCH, however, that the rule of lenity provides an independent basis for ruling in favor of a defendant in a closer case, and I join Parts II–IV of his opinion concurring in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–5279

_____

## WILLIAM DALE WOODEN, PETITIONER
## *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[March 7, 2022]

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion in full. In light of JUSTICE GORSUCH's thoughtful concurrence in the judgment, I write separately to briefly explain why the rule of lenity has appropriately played only a very limited role in this Court's criminal case law. And I further explain how another principle—the presumption of *mens rea*—can address JUSTICE GORSUCH's important concern, which I share, about fair notice in federal criminal law.

A common formulation of the rule of lenity is as follows: If a federal criminal statute is grievously ambiguous, then the statute should be interpreted in the criminal defendant's favor. See *Ocasio* v. *United States*, 578 U. S. 282, 295, n. 8 (2016). Importantly, the rule of lenity does not apply when a law merely contains some ambiguity or is difficult to decipher. As this Court has often said, the rule of lenity applies only when "'after seizing everything from which aid can be derived,'" the statute is still grievously ambiguous. *Ibid.* (quoting *Muscarello* v. *United States*, 524 U. S. 125, 138–139 (1998)); see *Shular* v. *United States*, 589 U. S. \_\_\_, \_\_\_, \_\_\_ (2020) (KAVANAUGH, J., concurring) (slip op., at 1, 3). The rule "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan* v. *United States*, 364 U. S. 587, 596

(1961). Our repeated use of the term "grievous ambiguity"
underscores that point. See, *e.g., Shaw* v. *United States*,
580 U. S. 63, 71 (2016); *Salman* v. *United States*, 580 U. S.
39, 51 (2016); *Abramski* v. *United States*, 573 U. S. 169, 188,
n. 10 (2014).

Properly applied, the rule of lenity therefore rarely if ever
plays a role because, as in other contexts, "hard interpretive
conundrums, even relating to complex rules, can often be
solved." *Kisor* v. *Wilkie*, 588 U. S. ___, ___ (2019) (slip op.,
at 14); see also *Chevron U. S. A. Inc.* v. *Natural Resources
Defense Council, Inc.*, 467 U. S. 837, 843, n. 9 (1984). And
if "a reviewing court employs all of the traditional tools of
construction, the court will almost always reach a conclu-
sion about the best interpretation of the [law] at issue." *Ki-
sor,* 588 U. S., at ___ (KAVANAUGH, J., concurring in judg-
ment) (slip op., at 1).

In short, because a court must exhaust all the tools of
statutory interpretation before resorting to the rule of len-
ity, and because a court that does so often determines the
best reading of the statute, the rule of lenity rarely if ever
comes into play. In other words, "if lenity invariably comes
in 'last,' it should essentially come in never." D. Kahan,
Lenity and Federal Common Law Crimes, 1994 S. Ct. Rev.
345, 386. As I see it, that explains why this Court rarely
relies on the rule of lenity, at least as a decisive factor.

I would not upset our rule of lenity case law by making
the ambiguity trigger any easier to satisfy. For example, I
would not say that any front-end ambiguity in the statute
justifies resort to the rule of lenity even before exhausting
the tools of statutory interpretation. One major problem
with that kind of ambiguity trigger is that ambiguity is in
the eye of the beholder and cannot be readily determined on
an objective basis. Applying a looser front-end ambiguity
trigger would just exacerbate that problem, leading to sig-
nificant inconsistency, unpredictability, and unfairness in

application. See B. Kavanaugh, Fixing Statutory Interpretation, 129 Harv. L. Rev. 2118, 2136–2139 (2016).

For those reasons, I would not alter our rule of lenity case law. That said, I very much agree with JUSTICE GORSUCH about the importance of fair notice in federal criminal law. But as I see it, that concern for fair notice is better addressed by other doctrines that protect criminal defendants against arbitrary or vague federal criminal statutes—in particular, the presumption of *mens rea.*

The deeply rooted presumption of *mens rea* generally requires the Government to prove the defendant's *mens rea* with respect to each element of a federal offense, unless Congress plainly provides otherwise. See *Rehaif* v. *United States*, 588 U. S. \_\_\_, \_\_\_ (2019) (slip op, at 3); see also *Flores-Figueroa* v. *United States*, 556 U. S. 646, 652 (2009); W. Eskridge, Interpreting Law: A Primer on How To Read Statutes and the Constitution 350–351 (2016); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 303–312 (2012). In addition, with respect to federal crimes requiring "willfulness," the Court generally requires the Government to prove that the defendant was aware that his conduct was unlawful. See *Bryan* v. *United States*, 524 U. S. 184, 191–193 (1998); *Cheek* v. *United States*, 498 U. S. 192, 201–203 (1991).

To be sure, if a federal criminal statute does not contain a "willfulness" requirement and if a defendant is prosecuted for violating a legal prohibition or requirement that the defendant honestly was unaware of and reasonably may not have anticipated, unfairness can result because of a lack of fair notice. That scenario could arise with some *malum prohibitum* federal crimes, for example. But when that fair notice problem arises, one solution where appropriate could be to require proof that the defendant was aware that his conduct was unlawful. Alternatively, another solution could be to allow a mistake-of-law defense in certain cir-

cumstances—consistent with the longstanding legal principle that an act is not culpable unless the mind is guilty. See *Morissette* v. *United States*, 342 U. S. 246, 250–252 (1952).

In sum, I would not invite the inconsistency, unpredictability, and unfairness that would result from expanding the rule of lenity beyond its very limited place in the Court's case law. I would, however, continue to vigorously apply (and where appropriate, extend) *mens rea* requirements, which as Justice Robert Jackson remarked, are "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Id.*, at 250.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–5279

_____

## WILLIAM DALE WOODEN, PETITIONER
### *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[March 7, 2022]

JUSTICE BARRETT, with whom JUSTICE THOMAS joins,
concurring in part and concurring in the judgment.

I join all but Part II–B of the Court's opinion. I agree with
the Court's analysis of the ordinary meaning of the word
"occasion" and its conclusion that Wooden's burglaries
count only once under the Armed Career Criminal Act. But
I do not share the Court's view that Congress ratified the
Solicitor General's brief confessing error in *United States* v.
*Petty*, 798 F. 2d 1157 (CA8 1986), when it amended the Act
to add the occasions clause. This argument depends on two
flawed inferences: first, that Congress specifically intended
to reject the Eighth Circuit's initial decision in *Petty*, and
second, that it embraced the former Solicitor General's rea-
soning for why that decision was wrong. The latter error,
in particular, is likely to work mischief down the line.

\*  \*  \*

As an initial matter, the Court errs in asserting that the
occasions clause was crafted to reject the result that the
Eighth Circuit initially reached in *Petty*. (Recall that the
Eighth Circuit changed its view on remand after the Solici-
tor General confessed error in this Court.) The Court's evi-
dence for that proposition consists of nothing but a short
analysis that Senator Byrd submitted for the Congressional
Record in calendaring the proposed amendment. *Ante,* at

12.

*Petty*'s tenuous tie to the statute distinguishes this case from the many in which we have recognized that a judicial decision or line of decisions has provided the impetus for legislation. In some instances, enacted findings have explicitly connected the statute to a prior decision. See, *e.g., Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 694 (2014) ("Congress responded to [*Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990)] by enacting" the Religious Freedom Restoration Act); 42 U. S. C. §§2000bb(a)(4), (b)(1) (stating that RFRA was meant to restore the legal framework in place prior to *Smith*). In others, a well-established legal backdrop has revealed Congress' reasons for acting. See, *e.g., Dickerson* v. *United States*, 530 U. S. 428, 436 (2000) ("Given [the statute's] express designation of voluntariness as the touchstone of admissibility, its omission of any warning requirement, and the instruction for trial courts to consider a nonexclusive list of factors relevant to the circumstances of a confession, we agree with the Court of Appeals that Congress intended by its enactment to overrule" *Miranda* v. *Arizona*, 384 U. S. 436 (1966)). But here, no enacted language mentions *Petty*, and the Court wisely does not portray the case—a single, subsequently vacated court of appeals opinion—as part of the settled legal landscape against which ACCA was amended. The only thread connecting the occasions clause to *Petty* is legislative history, and the problems with legislative history are well rehearsed. See, *e.g., American Broadcasting Cos.* v. *Aereo, Inc.*, 573 U. S. 431, 458 (2014) (Scalia, J., dissenting) (arguing that the Court had treated "a few isolated snippets of legislative history" as "authoritative evidence of congressional intent even though they come from a single report issued by a committee whose members make up a small fraction of one of the two Houses of Congress").

The Court needs the *Petty* backstory, though, to make its

second, more significant leap: that Congress endorsed the reasoning behind the Solicitor General's confession of error in that case. *Ante,* at 12. This move goes bigger than legislative history because it goes beyond the standard error of treating legislators' views about statutory language as authoritative. It presents Senator Byrd's statement as definitive approval of the Solicitor General's position in *Petty* (an error of the standard variety), and then uses that approval to graft the particulars of the Solicitor General's brief onto the statute (which is really a bridge too far).

Again, I will not belabor why this approach is flawed. See, *e.g., Blanchard* v. *Bergeron,* 489 U. S. 87, 98 (1989) (Scalia, J., concurring in part and concurring in judgment) ("That the Court should refer to the citation of three District Court cases in a document issued by a single committee of a single house as the action *of Congress* displays the level of unreality that our unrestrained use of legislative history has attained"); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 386 (2012) ("Even if the members of each house wish to do so, they cannot assign responsibility for making law—or the details of law—to one of their number, or to one of their committees"). But it is worth discussing the Court's jump from legislative history to litigation history because of what it might mean in later cases.

The Court elevates the Solicitor General's brief to the status of a governing test. Consider how that choice plays out in this case. The Government argues that Wooden's burglaries occurred on separate occasions because they were committed sequentially (unlike Petty's robberies, which the Government says were committed simultaneously). That argument fails for the reasons that the Court explains in Part II–A of its opinion, which I join: Such close-in-time crimes, even if sequential, happen on the same "occasion." But rather than resting only on the statutory language, the Court also invokes the reasoning in the *Petty* brief. It says

that the Government cannot be right because

> "[n]othing about the Solicitor General's confession of error, or the action Congress took in its wake, suggests any concern for the exact ordering of Petty's actions. Each was based instead on another idea: A person who has robbed a restaurant, and done nothing else, is not a 'habitual offender[]' or 'career criminal[].' . . . It was that focus on 'revolving door' felons that the Solicitor General referenced in arguing that the courts in *Petty* had construed ACCA too broadly." *Ante,* at 13–14 (quoting Addendum to Brief for Petitioner 27a and citing 134 Cong. Rec. 13782–13783 (1988)).

Thus, in the Court's view, the Government's argument fails not only because of the statutory text but also because the Solicitor General's 35-year-old brief, which the statute supposedly incorporates, rules it out. That is not how statutory interpretation is supposed to work.*

The Court's approach will likely have downstream effects because it invites both litigants and lower courts to mine the Solicitor General's brief for guidance on the scope of the occasions clause—as the parties did in this case. To be sure, the most important indicators of whether crimes occurred on a single "occasion"—proximity in time and location—will matter most. But on top of that, lower courts may place weight on the buzzwords that the Court highlights in the Solicitor General's brief: "repeat offenders," "habitual offenders," "recidivists," "revolving door offenders," and "three time loser[s]." *Ante,* at 11 (internal quotation marks omitted). And that could sow unnecessary confusion.

———————

*The Court disclaims any intent to ratify the Solicitor General's brief. *Ante,* at 12, n. 5. If the brief is not essential to the Court's holding, then one might wonder why the Court quotes it extensively and uses it as a yardstick to measure (and reject) the Government's current view. Lower courts should take this disclaimer at face value, though, as notice that the Court's remarks on the details of the *Petty* brief are nonbinding dicta.

Take a case involving three drug sales that occurred at 8 o'clock on three consecutive evenings at three different locations. Applying the ordinary meaning of the text seems straightforward enough: The three offenses are separate occasions because they occurred a day apart and at different locations, notwithstanding the similarity of the crimes. Yet factor in the details of the Solicitor General's brief, and the result is not so clear. Is a defendant who committed three crimes over the course of three days really a "revolving door offende[r]" or a true "recidivis[t]"? *Ibid.* (internal quotation marks omitted). Maybe not—those labels evoke a distinct inquiry. And though the labels may capture what Congress was getting at, the statute chooses a particular way of getting there: the text of the occasions clause. We should leave it at that.

\*   \*   \*

The Court glosses this statute by leaning on weak evidence of Congress' impetus for amending the statute, followed by still weaker evidence that Congress embraced the reasoning of a brief filed by the Solicitor General. I would impute to Congress only what can fairly be imputed to it: the words of the statute. Crimes within a spree like Wooden's do not count as separate ACCA predicates because of the statutory language, not because those who drafted the amendment had either Petty's case or the Solicitor General's prose in mind.

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–5279

———————

## WILLIAM DALE WOODEN, PETITIONER
## *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[March 7, 2022]

JUSTICE GORSUCH, with whom JUSTICE SOTOMAYOR joins as to Parts II, III, and IV, concurring in the judgment.

Once more we confront the Armed Career Criminal Act. Disputes over the statute's meaning have occupied so much of this Court's attention over so many years that various pieces of the law and doctrines associated with it have earned their own nicknames—the Elements Clause, the Residual Clause, the Categorical Approach. Now comes the Occasions Clause. This subsection requires courts to impose 15-year mandatory minimum prison sentences on individuals who unlawfully possess a gun if they also have three or more prior convictions for certain crimes "committed on occasions different from one another." 18 U. S. C. § 924(e)(1). For years, lower courts have struggled with the Occasions Clause, reaching contradictory judgments on similar facts. We took this case hoping to bring some clarity to at least this particular corner of the ACCA.

I

What do we resolve? The Court rejects the Sixth Circuit's rule that crimes occurring sequentially always occur on different occasions. Sometimes, the Court holds, crimes committed one after another can take place on a single occasion. No one doubts that William Wooden had to break through

wall after wall dividing 10 separate storage units to complete his crimes. Or that, by the end of it all, he committed 10 distinct criminal offenses. But, the Court explains, none of this automatically dictates the conclusion that his crimes occurred on different occasions. *Ante*, at 4–6.

Beyond that clear holding, however, lies much uncertainty. Rather than simply observe that sequential crimes can occur on one occasion and return this case to the Court of Appeals for resolution, the Court ventures further. It directs lower courts faced with future Occasions Clause cases to employ a "multi-factored" balancing test in which "a range of circumstances may be relevant." *Ante*, at 8.

The potentially relevant factors turn out to be many and disparate. The Court says that offenses committed close in time "often"—but not always—take place on a single occasion. *Ibid.* Offenses separated by "substantial gaps in time or significant intervening events" usually occur on separate occasions—though what counts as a "substantial" gap or "significant" event remains unexplained. *Ibid.* "Proximity of location" can be "important" too—but it is not necessarily dispositive. *Ibid.* Whether the defendant's crimes involve "similar or intertwined" conduct also "may"—or may not— make a difference. *Ibid.* And even this long list of factors probably is not exhaustive. *Ante*, at 8–9. Nor does the list come with any instructions on how to weigh the relative importance of so many factors or how to resolve cases when those factors point in different directions.

The Court's multi-factor balancing test may represent an earnest attempt to bring some shape to future litigation under the Occasions Clause. But it is still very much a judicial gloss on the statute's terms—and one that is unnecessary to resolve the case at hand. Multi-factor balancing tests of this sort, too, have supplied notoriously little guidance in many other contexts, and there is little reason to think one might fare any better here. In fact, many lower courts faced

with Occasions Clause cases already look to the same "multiplicity of factors" the Court prescribes today, including geographic location, the nature of the offenses, the number of victims, the means employed, and time. See, *e.g.*, *United States* v. *Letterlough*, 63 F. 3d 332, 335–336 (CA4 1995) (listing factors and collecting cases). So far the results have proven anything but predictable given the almost infinite number of factual permutations these cases can present. And all of this has yielded a grave problem: Some individuals face mandatory 15-year prison terms while other similarly situated persons do not—with the results depending on little more than how much weight this or that judge chooses to assign this or that factor.

Admittedly, a long list of factors may supply a clear answer in some cases. Who doubts that a single gunshot hitting two people involves two crimes on a single occasion— or that two murders separated by years and miles take place on separate occasions? The problem is that beyond easy cases like those lies a universe of hard ones, where a long list of non-exhaustive, only sometimes relevant, and often incommensurable factors promises to perpetuate confusion in the lower courts and conflicting results for those whose liberties hang in the balance.

Consider some examples. Imagine a defendant who sells drugs to the same undercover police officer twice at the same street corner one hour apart. Do the sales take place on the same occasion or different ones? Remember, "[p]roximity of location" and "similar or intertwined . . . conduct" suggest a single occasion. *Ante*, at 8. But "substantial gaps in time" often indicate two episodes. *Ibid.* With these factors pointing in different directions and no clear rule for resolving their conflicting guidance, who can be surprised when reasonable minds reach different conclusions?

Next, take the Court's barroom brawl hypothetical. Because it involves "a continuous stream of closely related criminal acts at one location," the Court says the crimes

necessarily occur on a single "occasion." *Ibid.* But what if our hypothetical defendant assaults one victim inside the bar and another 20 minutes later in the street outside, in part because the second victim called the police? Are those two assaults part of a "continuous stream" of conduct? Do they even occur "at one location"?

Imagine, too, an individual who commits a robbery or burglary then later assaults a pursuing police officer: Does the later assault happen on a separate "occasion" from the initial crime? The times, locations, and crimes differ, but they are related in certain respects too. Unsurprisingly, the courts of appeals have disagreed in cases like these. Compare *United States* v. *Leeson*, 453 F. 3d 631, 639–640 (CA4 2006) (yes), with *United States* v. *Graves*, 60 F. 3d 1183, 1184–1185, 1187 (CA6 1995) (no).

Now return to Mr. Wooden. The Court rightly says that crimes taking place sequentially can sometimes happen on a single occasion. *Ante*, at 5–6. But the Court does not stop there and remand this case to the Court of Appeals. After prescribing a long list of factors for use in future cases, it proceeds to declare that "every" factor points in the same direction in this case and dictates the conclusion that Mr. Wooden's crimes occurred on a single occasion. *Ante*, at 9. In particular, the Court stresses that his crimes involved storage units in the same building (location) and took place over the same night (timing). *Ibid.*

But even when it comes to Mr. Wooden, it's not entirely clear whether the Court's factors compel only one conclusion. When it comes to location, each storage unit had its own number and space, each burglary infringed on a different person's property, and Mr. Wooden had to break through a new wall to enter each one. Suppose this case involved not adjacent storage units but adjacent townhomes or adjacent stores in a mall. If Mr. Wooden had torn through the walls separating them, would we really say his crimes occurred at the same location?

The answer is no more certain when the question turns to timing. Nothing in the record before us speaks to how long Mr. Wooden lingered over his crimes—whether they spanned one hour or many. Meanwhile, the record does show that between each of his burglaries Mr. Wooden faced a choice between walking away or breaking through another wall into a new storage unit. In this way, each additional obstacle presented a kind of intervening event. As the Sixth Circuit put it, there was no reason why Mr. Wooden could not have "call[ed] it a night after the first burglary." 945 F. 3d 498, 505 (2019). Every judge who confronted this case before us thought his crimes happened on different occasions. And it's not hard to see how different minds might come to different conclusions.

So what accounts for the Court's disposition in Mr. Wooden's favor? The Court insists that its array of factors point inexorably to the conclusion that his crimes occurred on a single occasion. But when it comes to location, one could view Mr. Wooden's crimes as having taken place in one location or several, and the Court chooses the more lenient option. When it comes to timing, one could view his crimes as transpiring in a single episode or as having many potential breaks in the action, and again the Court chooses the more forgiving course.

Respectfully, all this suggests to me that the key to this case does not lie as much in a multiplicity of factors as it does in the rule of lenity. Under that rule, any reasonable doubt about the application of a penal law must be resolved in favor of liberty. Because reasonable minds could differ (as they have differed) on the question whether Mr. Wooden's crimes took place on one occasion or many, the rule of lenity demands a judgment in his favor. The rule seems destined as well to play an important role in many other cases under the Occasions Clause—a setting where the statute at issue supplies little guidance, does not define its key term, and the word it does use ("occasions") can lead

different people to different intuitions about the same set of facts. No list of factors, however thoughtful, can resolve every case under a law like that. Many ambiguous cases are sure to arise. In them, a rule of decision is required— and lenity supplies it.

## II

The "rule of lenity" is a new name for an old idea—the notion that "penal laws should be construed strictly." *The Adventure*, 1 F. Cas. 202, 204 (No. 93) (CC Va. 1812) (Marshall, C. J.). The rule first appeared in English courts, justified in part on the assumption that when Parliament intended to inflict severe punishments it would do so clearly. 1 W. Blackstone, Commentaries on the Laws of England 88 (1765) (Blackstone); 2 M. Hale, The History of the Pleas of the Crown 335 (1736); see also L. Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 749–751 (1935). In the hands of judges in this country, however, lenity came to serve distinctively American functions—a means for upholding the Constitution's commitments to due process and the separation of powers. Accordingly, lenity became a widely recognized rule of statutory construction in the Republic's early years.[1]

Consider lenity's relationship to due process. Under the Fifth and Fourteenth Amendments, neither the federal government nor the States may deprive individuals of "life, liberty, or property, without due process of law." U. S. Const.,

---

[1] See, *e.g.*, *United States* v. *Morris*, 14 Pet. 464, 475 (1840); *United States* v. *Eighty-Four Boxes of Sugar*, 7 Pet. 453, 462–463 (1833); *Ronkendorff* v. *Taylor's Lessee*, 4 Pet. 349, 359 (1830); *Carver* v. *Jackson*, 4 Pet. 1, 92–93 (1830); *United States* v. *Sheldon*, 2 Wheat. 119, 121–122 (1817); *United States* v. *Lawrence*, 3 Dall. 42, 45 (1795); *Prescott* v. *Nevers*, 19 F. Cas. 1286, 1288–1289 (No. 11,390) (CC Me. 1827) (Story, J.); *The Enterprise*, 8 F. Cas. 732, 734–735 (No. 4,499) (CC NY 1812) (Livingston, J.); *Bray* v. *The Atalanta*, 4 F. Cas. 37, 38 (No. 1,819) (DC SC 1794).

Amdts. 5, 14. Generally, that guarantee requires govern-
ments seeking to take a person's freedom or possessions to
adhere to "those settled usages and modes of proceeding"
found in the common law. *Murray's Lessee* v. *Hoboken Land
& Improvement Co.*, 18 How. 272, 277 (1856); N. Chapman
& M. McConnell, Due Process as Separation of Powers, 121
Yale L. J. 1672, 1774–1775 (2012). And among those "set-
tled usages" is the ancient rule that the law must afford or-
dinary people fair notice of its demands. See, *e.g.*, *Sessions*
v. *Dimaya*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (GORSUCH, J., con-
curring in part and concurring in judgment) (slip op., at 3–
5). Lenity works to enforce the fair notice requirement by
ensuring that an individual's liberty always prevails over
ambiguous laws.

Early cases confirm the message. In *United States* v.
*Wiltberger*, a sailor had killed an individual on a river in
China. 5 Wheat. 76, 77 (1820). But the federal statute un-
der which he was charged criminalized manslaughter only
on the "'high seas.'" *Id.*, at 93 (quoting Act of Apr. 30, 1790,
§ 12, 1 Stat. 115). Chief Justice Marshall acknowledged
that other parts of the law might have suggested Congress
intended to capture the sailor's conduct. 5 Wheat., at 105.
But he insisted that "penal laws are to be construed strictly"
because of "the tenderness of the law for the rights of indi-
viduals"—and, more specifically, the right of every person
to suffer only those punishments dictated by "the plain
meaning of words." *Id.*, at 95–96. Where the text of a law
mandates punishment for the defendant's conduct in terms
an ordinary person can understand, a court's job is to apply
it as written. *Id.*, at 95. But where uncertainty exists, the
law gives way to liberty.

*United States* v. *Mann* tells a similar story. 26 F. Cas.
1153 (No. 15,718) (CC NH 1812). There, Justice Story faced
the question whether a federal statute authorized punish-
ment against a shipowner. After concluding the statutory

text did not supply a "definite" answer, Justice Story explained that "[i]t is a principle grown hoary in age and wisdom, that penal statutes are to be construed strictly." *Id.*, at 1157. And that principle more or less resolved the case. "I will not be the first judge," Justice Story wrote, "to strain a proviso against [a] citizen, beyond the fair import of its expressions." *Ibid.* Here again, the connection between lenity and fair notice was clear: If the law inflicting punishment does not speak "plainly" to the defendant's conduct, liberty must prevail. *Ibid.*

 Of course, most ordinary people today don't spend their leisure time reading statutes—and they probably didn't in Justice Marshall's and Justice Story's time either. But lenity's emphasis on fair notice isn't about indulging a fantasy. It is about protecting an indispensable part of the rule of law—the promise that, whether or not individuals happen to read the law, they can suffer penalties only for violating standing rules announced in advance. As the framers understood, "subjecting . . . men to punishment for things which, when they were done, were breaches of no law . . . ha[s] been, in all ages, the favorite and most formidable instrumen[t] of tyranny." The Federalist No. 84, pp. 511–512 (C. Rossiter ed. 1961) (A. Hamilton); see also *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931) ("Although it is not likely that a criminal will carefully consider the text of the law . . . fair warning should be given to the world in language that the common world will understand").

Closely related to its fair notice function is lenity's role in vindicating the separation of powers. Under our Constitution, "[a]ll" of the federal government's "legislative Powers" are vested in Congress. Art. I, § 1. Perhaps the most important consequence of this assignment concerns the power to punish. Any new national laws restricting liberty require the assent of the people's representatives and thus input from the country's "many parts, interests and classes." The

Federalist No. 51, at 324 (J. Madison). Lenity helps safeguard this design by preventing judges from intentionally or inadvertently exploiting "doubtful" statutory "expressions" to enforce their own sensibilities. *Mann*, 26 F. Cas., at 1157. It "places the weight of inertia upon the party that can best induce Congress to speak more clearly," forcing the government to seek any clarifying changes to the law rather than impose the costs of ambiguity on presumptively free persons. *United States* v. *Santos*, 553 U. S. 507, 514 (2008) (plurality opinion). In this way, the rule helps keep the power of punishment firmly "in the legislative, not in the judicial department." *Wiltberger*, 5 Wheat., at 95.

Doubtless, lenity carries its costs. If judges cannot enlarge ambiguous penal laws to cover problems Congress failed to anticipate in clear terms, some cases will fall through the gaps and the legislature's cumbersome processes will have to be reengaged. But, as the framers appreciated, any other course risks rendering a self-governing people "slaves to their magistrates," with their liberties dependent on "the private opinions of the judge." 4 Blackstone 371 (1769). From the start, lenity has played an important role in realizing a distinctly American version of the rule of law—one that seeks to ensure people are never punished for violating just-so rules concocted after the fact, or rules with no more claim to democratic provenance than a judge's surmise about legislative intentions.

### III

It may be understandable why the Court declines to discuss lenity today. Certain controversies and misunderstandings about the rule have crept into our law in recent years. I would take this opportunity to answer them.

Begin with the most basic of these controversies—the degree of ambiguity required to trigger the rule of lenity. Some have suggested that courts should consult the rule of

lenity only when, after employing every tool of interpreta-
tion, a court confronts a "grievous" statutory ambiguity.
See, *e.g.*, *Shaw* v. *United States*, 580 U. S. \_\_\_, \_\_\_ (2016)
(slip op., at 8) (internal quotation marks omitted).  But ask
yourself:  If the sheriff cited a loosely written statute as au-
thority to seize your home, would you be satisfied with a
judicial explanation that, yes, the law was ambiguous, but
the sheriff wins anyway because the ambiguity isn't "griev-
ous"?  If a judge sentenced you to decades in prison for con-
duct that no law clearly proscribed, would it matter to you
that the judge considered the law "merely"—not "griev-
ously"—ambiguous?

  This "grievous" business does not derive from any well-
considered theory about lenity or the mainstream of this
Court's opinions.  Since the founding, lenity has sought to
ensure that the government may not inflict punishments on
individuals without fair notice and the assent of the peo-
ple's representatives.  See *supra*, at 6–9.  A rule that al-
lowed judges to send people to prison based on intuitions
about "merely" ambiguous laws would hardly serve those
ends.  Tellingly, this Court's early cases did not require a
"grievous" ambiguity before applying the rule of lenity.  In-
stead, they followed other courts in holding that, "[i]n the
construction of a penal statute, it is well settled . . . that *all
reasonable doubts* concerning its meaning ought to operate
in favor of [the defendant]."  *Harrison* v. *Vose*, 9 How. 372,
378 (1850) (emphasis added).[2]  Nineteenth century trea-
tises seeking to record the rule put the point this way:  "[I]f

————————

   [2] See also *United States* v. *Lacher*, 134 U. S. 624, 628 (1890) (conduct
must be "plainly and unmistakably within the statute"); *United States* v.
*Hartwell*, 6 Wall. 385, 395–396 (1868) (observing that "penal laws are to
be construed strictly," such that "they must . . . leave no room for a rea-
sonable doubt" as to the legislature's meaning); *The Merino*, 9 Wheat.
391, 403–404 (1824) (affirming a conviction under a "highly penal" law
after concluding that "no reasonable doubt" existed as to its application);

there is such an ambiguity in a penal statute as to leave reasonable doubts of its meaning, it is the duty of a court not to inflict the penalty." J. Sutherland, Statutes and Statutory Construction § 353, p. 444 (1891); see also 1 J. Bishop, Commentaries on the Criminal Law § 133, p. 172 (2d ed. 1858) (Bishop). Many of this Court's contemporary cases employ the same standard too, if sometimes in slightly different words.[3]

So where did the talk about "grievous" ambiguities begin? The problem may trace to *Huddleston* v. *United States*, 415 U. S. 814, 831 (1974). That decision came during a "bygone era" characterized by a more freewheeling approach to statutory construction. *Food Marketing Institute* v. *Argus Leader Media*, 588 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 8) (internal quotation marks omitted). Nor did the decision pause to consider, let alone overrule, any of this Court's preexisting cases explaining lenity's original and historic scope. Indeed, in the years that followed *Huddleston*, this

——————

*The Enterprise*, 8 F. Cas., at 734 ("It should be a principal of every criminal code, and certainly belongs to ours, that no person be adjudged guilty of an offence unless it be created and promulgated in terms which leave no reasonable doubt of their meaning"); *The Adventure*, 1 F. Cas. 202, 204 (No. 93) (CC Va. 1812) (observing that lenity applies "in cases where the [legislature's] intention is not distinctly perceived," such that "the mind balances and hesitates between . . . two constructions").

[3] See, *e.g.*, *United States* v. *Davis*, 588 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 19); *Yates* v. *United States*, 574 U. S. 528, 547–548 (2015) (plurality opinion); *Skilling* v. *United States*, 561 U. S. 358, 410–411 (2010); *United States* v. *Santos*, 553 U. S. 507, 513–515 (2008) (plurality opinion); *Scheidler* v. *National Organization for Women, Inc.*, 537 U. S. 393, 409 (2003); *Cleveland* v. *United States*, 531 U. S. 12, 25 (2000); *United States* v. *Granderson*, 511 U. S. 39, 54 (1994); *Crandon* v. *United States*, 494 U. S. 152, 158 (1990); *United States* v. *Kozminski*, 487 U. S. 931, 951–952 (1988); *McNally* v. *United States*, 483 U. S. 350, 359–360 (1987); *Dowling* v. *United States*, 473 U. S. 207, 228 (1985); *Liparota* v. *United States*, 471 U. S. 419, 427 (1985); *United States* v. *Bass*, 404 U. S. 336, 348–349 (1971); *Rewis* v. *United States*, 401 U. S. 808, 812 (1971); *Bell* v. *United States*, 349 U. S. 81, 83 (1955).

Court routinely returned to a more traditional understanding.  See n. 3, *supra*.  And even in *Huddleston* itself, the discussion of "grievous" ambiguities was dicta—the Court found no ambiguity of *any* kind in the statute at issue.  See 415 U. S., at 831–832.  These peculiar circumstances hardly supply any court with a sound basis for ignoring or restricting one of the most ancient rules of statutory construction— let alone one so closely connected to the Constitution's protections.[4]

A second and related misunderstanding has crept into our law.  Sometimes, Members of this Court have suggested that we possess the authority to punish individuals under ambiguous laws in light of our own perceptions about some piece of legislative history or the statute's purpose.  See, *e.g.*, *Moskal* v. *United States*, 498 U. S. 103, 109–111 (1990); *United States* v. *R. L. C.*, 503 U. S. 291, 305 (1992) (plurality opinion).  Today's decision seemingly nods in the same direction.  In a sentence in Part II–A, the Court says that statutory purpose is one factor a judge may "kee[p] an eye on" when deciding whether to enhance an individual's sentence under the Occasions Clause.  *Ante*, at 8–9.  The Court then proceeds to discuss the Clause's legislative history at length in Part II–B.  It may be that the Court today intends

―――――――――

[4] Supporters of the "grievous" ambiguity standard sometimes point to cases suggesting that lenity applies only after courts have "seiz[ed] everything from which aid can be derived" in ascertaining a statute's meaning.  See, *e.g.*, *Ocasio* v. *United States*, 578 U. S. 282, 295, n. 8 (2016) (internal quotation marks omitted).  But the "everything from which aid can be derived" language originated in *United States* v. *Fisher*, 2 Cranch 358, 386 (1805).  And as uttered by Chief Justice Marshall, it had nothing to do with lenity.  Instead, it concerned only the question whether a court could use a statute's title in ascertaining its meaning.  See *ibid.*  What's more, when the Court first applied the phrase to lenity, it expressly reiterated the rule that, "before we choose the harsher alternative," it is necessary that "Congress should have spoken in language that is clear and definite."  *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 221–222 (1952).  None of this supports requiring a "grievous" ambiguity before applying the rule of lenity.

to suggest only that judges may consult legislative history and purpose to limit, never expand, punishment under an ambiguous statute. But even if that's so, why take such a long way around to the place where lenity already stands waiting?

The right path is the more straightforward one. Where the traditional tools of statutory interpretation yield no clear answer, the judge's next step isn't to legislative history or the law's unexpressed purposes. The next step is to lenity. As Justice Story explained, because "penal statutes are construed strictly . . . forfeitures are not to be inflicted by straining the words so as to reach some conjectural policy." *United States* v. *Open Boat*, 27 F. Cas. 354, 357 (No. 15,968) (CC Me. 1829). "[I]f [cases] are not provided for in the text of the act, courts of justice do not adventure on the usurpation of legislative authority." *Ibid.* Or as Chief Justice Marshall put it, "[t]o determine that a case is within the intention of a statute, its language must authorise us to say so." *Wiltberger*, 5 Wheat., at 96. Any other approach would be "unsafe" and "dangerous"—risking the possibility that judges rather than legislators will control the power to define crimes and their punishments. *Ibid.*; see also *Hughey* v. *United States*, 495 U. S. 411, 422 (1990) ("[L]ongstanding principles of lenity . . . preclude our resolution of the ambiguity . . . on the basis of general declarations of policy in the statute and legislative history"); *R. L. C.*, 503 U. S., at 307–311 (Scalia, J., concurring in part and concurring in judgment); *Bell* v. *United States*, 349 U. S. 81, 83 (1955).

At least one more misconception has arisen in recent years. In debating the merits of the rule of lenity, some have treated the rule as an island unto itself—a curiosity

unique to criminal cases. But in truth, lenity has long applied outside what we today might call the criminal law.[5] And it is just one of a number of judicial doctrines that seek to protect fair notice and the separation of powers. Vagueness doctrine and others besides spring from similar aspirations. From time to time and for historically contingent reasons, one or another of these doctrines has come into or gone out of fashion. But narrow one avenue and the same underlying rule-of-law imperatives will eventually find another way to express themselves. None of these doctrines should be artificially divorced from the others; all are worthy of our respect.[6]

## IV

The rule of lenity has a critical role to play in cases under

––––––––––

[5] Historically, lenity applied to all "penal" laws—that is, laws inflicting any form of punishment, including ones we might now consider "civil" forfeitures or fines. See, *e.g.*, Bishop § 114, at 155–156; *The Enterprise*, 8 F. Cas., at 734; *Eighty-Four Boxes of Sugar*, 7 Pet., at 462; see also C. Nelson, The Constitutionality of Civil Forfeiture, 125 Yale L. J. 2446, 2498–2500 (2016).

[6] JUSTICE KAVANAUGH does not contest lenity's grounding in our history or its connection to our Constitution's commitments. Nor does he offer any reason to believe the "grievous" ambiguity standard is anything other than a modern phenomenon grounded in dicta. Even so, he insists that lenity should "rarely if ever" apply, because judges "'will almost always reach a conclusion about the best interpretation'" that resolves ambiguity. *Ante*, at 2 (concurring opinion). I agree that judges sometimes jump too quickly to ambiguity. But doctrines like lenity and *contra proferentem* have played an essential role in our law for centuries, resolving ambiguities where they persist. Likewise, while I agree with JUSTICE KAVANAUGH about the importance of the *mens rea* presumption, I do not see it as a substitute for the rule of lenity so much as one instantiation of it. *Ante*, at 3–4. Indeed, this Court has often observed that "requiring *mens rea* is in keeping with our longstanding recognition of" lenity's demands. *Liparota*, 471 U. S., at 419; *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 437 (1978); *Eighty-Four Boxes of Sugar*, 7 Pet., at 462–463 (applying lenity to hold that a penal law cannot be premised on mere "accident or mistake").

the Occasions Clause. The statute contains little guidance, and reasonable doubts about its application will arise often. When they do, they should be resolved in favor of liberty. Today, the Court does not consult lenity's rule, but neither does it forbid lower courts from doing so in doubtful cases. That course is the sound course. Under our rule of law, punishments should never be products of judicial conjecture about this factor or that one. They should come only with the assent of the people's elected representatives and in laws clear enough to supply "fair warning . . . to the world." *McBoyle*, 283 U. S., at 27.[7]

————————

[7] A constitutional question simmers beneath the surface of today's case. The Fifth and Sixth Amendments generally require the government in criminal cases to prove every fact essential to an individual's punishment to a jury beyond a reasonable doubt. See *United States* v. *Haymond*, 588 U. S. \_\_\_, \_\_\_–\_\_\_ (2019) (plurality opinion) (slip op., at 5–6). In this case, however, only judges found the facts relevant to Mr. Wooden's punishment under the Occasions Clause, and they did so under only a preponderance of the evidence standard. Because Mr. Wooden did not raise a constitutional challenge to his sentence, the Court does not consider the propriety of this practice. But there is little doubt we will have to do so soon. See *United States* v. *Dudley*, 5 F. 4th 1249, 1273–1278 (CA11 2021) (Newsom, J., concurring in part and dissenting in part) (questioning whether the Occasions Clause inquiry can be squared with the Constitution); *United States* v. *Perry*, 908 F. 3d 1126, 1134–1136 (CA8 2018) (Stras, J., concurring) (same); *United States* v. *Thompson*, 421 F. 3d 278, 287–295 (CA4 2005) (Wilkins, C. J., dissenting) (same). And it is hard not to wonder: If a jury must find the *facts* supporting a punishment under the Occasions Clause beyond a reasonable doubt, how may judges impose a punishment without equal certainty about the *law's* application to those facts?