[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-14159

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DAVION RIVERS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00252-WFJ-MRM-1

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Davion Rivers appeals his conviction for possessing a firearm as a convicted felon, 18 U.S.C. § 922(g)(1), and his 188-month prison sentence.  Rivers argues that the district court erroneously denied his motions to suppress (1) the firearm found on his person and (2) a spent shotgun shell from his residence.

Based on *Erlinger v. United States*, 602 U.S. 821 (2024), Rivers contends that the district court reversibly erred in sentencing him under the Armed Career Criminal Act ("ACCA") because a jury did not determine whether his prior serious drug offenses occurred on "occasions different from one another."  18 U.S.C. § 924(e).

After careful review of the record and the briefs, and with the benefit of oral argument, we affirm Rivers's conviction, vacate his sentence under *Erlinger*, and remand for resentencing.

## I. INDICTMENT AND NOT GUILTY PLEA

In 2020, a federal grand jury charged Rivers with knowingly possessing a firearm while knowing he was a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  As to the ACCA, the indictment listed three prior federal drug distribution convictions

for offenses Rivers committed on March 9, 13, and 17, 2017, respectively.[1]  Rivers pled not guilty.

## II. MOTIONS TO SUPPRESS

Pretrial, Rivers filed motions to suppress.  Here's the evidence from the suppression hearing.

### A.      The 9-1-1 Call

On the evening of August 10, 2020, Officers John Morningstar and Robert Gwodz for the police department in Bradenton, Florida, responded to a 9-1-1 call from a woman reporting a battery against her minor son.  The woman and her son reported that a black man with dreaded hair yelled at and punched her 15-year-old son in the face several times, breaking her son's jaw.  The attack happened near a two-story house in the 1900 block of 11th Avenue East going towards 27th Street in Bradenton.  She reported that the attacker was sitting outside the two-story house.

Because Officer Morningstar had worked in the neighborhood for 14 years, he knew there was only one large two-story house in this area of 11th Avenue East.  Morningstar also had responded to prior disturbances and juvenile probation curfew checks at the house.  He and Officer Gwodz visited the two-story house to "see if there were any witnesses or a suspect, anyone that saw anything."

---

[1] The indictment also listed three other prior convictions not at issue: (1) 2019 ammunition possession by a convicted felon; (2) 2014 firearm possession by a person previously found delinquent; and (3) 2014 concealed carry of a firearm.

## B.    The Two-Story House

The two-story house belonged to the Rivers family and has a 20th Street East entrance as well as a side entrance on 11th Avenue East, as shown in the photographs in the record.  The first photograph, below, depicts a pedestrian path extending from the road on 20th Street East to the front door of the house.  A chain-link fence encircles the property.  A sign posted on the fence in the front yard stated, "No trespassing.  Authorized personnel only.  Theft or vandalism on this site is a felony.  Violators will be prosecuted to the fullest extent of the law."  The front gate was closed and padlocked on August 10.



The second photograph, below, depicts the side driveway entrance to the house.  The side driveway runs off the public road of 11th Avenue East.  The side driveway extends from that public

road to a side door, next to which is a wooden deck or porch. Officer Morningstar testified that the gate at this side driveway (leading to the home's side door) was open that evening.



This photograph also partially shows a raised wooden porch at the end of the side driveway and beside the side door. Three wooden steps lead up from the driveway to the porch, and the porch has no roof, walls, or doors. The porch is completely unenclosed except for a wooden railing. Three signs posted on the tree next to the side driveway entrance stated: "Beware of the Dog"; "No Trespassing. Police Take Notice"; and "Posted. No Trespassing. Keep Out." Officer Morningstar testified that he did not see any of the signs because he arrived at the house at 9:22 p.m.

## C.    Arrest of Rivers at the House

That night, Officers Morningstar and Gwodz approached the side of the house using the side driveway on 11th Avenue East, which Morningstar testified was "the only way to really go there" and was the way that he and other officers customarily approached the two-story house.  Morningstar testified that the gate across the side driveway was open.  The officers proceeded up the side driveway past several parked cars and saw Rivers asleep on the porch.  The officers spoke loudly to Rivers, waking him.  When Rivers woke up, he told the officers to "get off his grandmother's property."

The officers then began walking back down the driveway to leave, but Rivers belligerently followed them.  Rivers told the officers to stop several times, but the officers responded that they were leaving.  Once the officers were on the 11th Avenue East roadway, Rivers stepped in front of the officers a few times, and after the officers stopped, Rivers moved out of their way.

Eventually, Rivers stepped in front of Officer Morningstar and pushed him.  After pushing Morningstar, Rivers turned and started walking away, at which time Morningstar saw "the butt of a handgun sticking out of [Rivers's] pocket."  Morningstar told Rivers to stop, deployed his Taser, and arrested Rivers for battery on a law enforcement officer.

After arresting Rivers, the officers conducted a pat-down and recovered a Taurus Judge revolver containing five spent shotgun shells from Rivers.  The officers also took Rivers's phone,

22-14159                Opinion of the Court                7

which revealed text messages regarding the purchase of the firearm a few days earlier.

Rivers did not testify at the suppression hearing. At trial, he testified to a different version of events, which we describe later.

### D.    Search Warrant

Three days later, officers applied for a warrant to search the Rivers residence for additional firearms and "[a]ny and all ammunition, magazines, spent casings, targets, or anything else used in conjunction with a firearm." In an affidavit, Detective Ben Pieper described the arrest, Rivers's felon status, his known residency at the address, his previous convictions for selling drugs, his prohibited possession of the firearm, and the fact that Rivers was released from federal prison ten days before this new arrest.

Detective Pieper also explained that, based on his training and experience in street crime and gang-related investigations, "it is known that people who own and/or possess firearms commonly have spare or extra ammunition with in [sic] their residence." He also explicated that "criminals who possess firearms typically possess ammunition for those firearms." On August 14, 2020, a state judge issued the search warrant.

### E.    District Court's Order

After the hearing, the district court denied Rivers's suppression motions. The district court found credible Officer Morningstar's testimony that (1) the side driveway entrance on the 11th Avenue East roadway was the entrance customarily used

when he visited the property, (2) he did not see the no trespassing signs because he arrived at night, and (3) the gate at the side driveway was open.

As to the search of Rivers, the district court found that the officers acted within the scope of an implied license to approach the home to conduct a knock-and-talk because they entered what appeared to be an open and customary entrance to the property and left when asked. The district court found that regardless of whether the porch was curtilage of the house, the officers' testimony that they did not enter or step onto the porch was uncontradicted, and in any event, their arrest of Rivers for battery on a law enforcement officer provided probable cause for a search incident to that arrest.

As to the search of the residence, the district court ruled that Detective Pieper's affidavit demonstrated probable cause that additional firearms or firearm accoutrements were "highly likely" to be present on the property where Rivers was arrested. Alternatively, the district court concluded that even if probable cause was lacking, it could not be lacking by much, so the good faith exception would apply.

### III. TRIAL

During trial, Officer Morningstar, Officer Gwodz, and Detective Pieper, among others, testified. They described the events and evidence as set forth above.

Rivers testified in his defense. Rivers's version of the August 10 events materially differed from the officers'. Rivers testified that

(1) the officers did not leave when he told them to leave; (2) the officers patted him down while he was on the porch and found no firearm; (3) although he was drinking earlier that night, he "[did not] remember pushing [Officer Morningstar]"; and (4) he did not send or receive the text messages about the firearm purchase, but another person had used his cell phone.

The jury convicted Rivers. The verdict form had only a single question of "guilty" or "not guilty" as to the § 922(g) firearm offense.

## IV. SENTENCING

### A.    Presentence Investigation Report

Initially, the presentence investigation report ("PSI") calculated a total offense level of 24 consisting of: (1) a base offense level of 20, U.S.S.G. § 2K2.1(a)(4)(A); (2) a two-level increase because the firearm was stolen, *id.* § 2K2.1(b)(4)(A); and (3) a two-level increase for obstruction of justice because Rivers committed perjury by testifying falsely at trial, *id.* § 3C1.1.

However, the PSI reported that (1) Rivers had three prior federal convictions for serious drug offenses committed on different occasions, (2) he was an armed career criminal subject to an ACCA-enhanced sentence, § 924(e), and (3) thus his total offense level became 33 under U.S.S.G. § 4B1.4(b)(3)(B). With a criminal history category of IV, Rivers's advisory guidelines imprisonment

range was 188 to 235 months.[2]  Under the ACCA, he was subject to a 15-year mandatory minimum sentence.

To support the ACCA enhancement, the PSI described Rivers's prior drug offenses.  As part of a March 2017 investigation in Manatee County, Florida, a confidential informant provided Rivers's phone number to officers.  On March 9, Rivers sold an undercover officer ("UC") 0.16 grams of hydromorphone and 0.524 grams of alprazolam for $50.  Later on March 9, Rivers sold the UC 0.178 grams of a powder substance containing a mixture of heroin, carfentanil, methamphetamine, and furanyl fentanyl for $40.

On March 13, Rivers sold the UC 0.108 grams of furanyl fentanyl and 2.5 grams of marijuana for $100.  On March 17, Rivers sold the UC 0.142 grams of a powder substance containing a mixture of heroin, fentanyl, and furanyl fentanyl for $100.

A single federal indictment with four counts charged Rivers with these small drug sales to the UC on March 9, 13, and 17, 2017.  Rivers pled guilty.  In April 2018, Rivers was sentenced to concurrent terms of five years of probation.

## B.    Rivers's Objections to the PSI

Rivers objected to the PSI's ACCA enhancement.  Rivers argued, *inter alia*, that (1) the small drug sales to the UC on March

---

[2] Because Rivers had a criminal history score of nine, his criminal history category was IV both with and without his armed career criminal designation. His score of nine included two points for committing the instant offense while under a federal sentence.  *See* U.S.S.G. § 4A1.1(d).

9, 13, and 17 constituted a single criminal episode and (2) in any event a jury, not the court, was required to find that his March drug offenses occurred on different occasions.

The government did not seek the ACCA enhancement. Rather, the government explained that while Rivers stipulated to being a felon, "he did not stipulate to the separate dates of [the prior] offenses nor did a jury determine he had qualifying convictions satisfying the different offense requirement of the [ACCA] statute."

## C.    Sentencing Hearing

At sentencing, the district court acknowledged that both the government and Rivers did not want it to impose the ACCA enhancement. But the district court explained that it had retrieved the documents from Rivers's 2017 drug case and had them placed in this record. Those documents were: (1) the indictment; (2) the magistrate judge's report and recommendation that Rivers's guilty plea was knowing and voluntary; (3) the judgment of conviction; and (4) the PSI and order adopting it without change.

The district court also reviewed what the PSI said about Rivers's 2017 offense conduct. The first sale occurred on March 9, 2017, when Rivers met the UC on 14th Street West in Bradenton in a brown car and sold the UC Xanax and morphine for $50. The UC had requested heroin, but Rivers had none to sell and advised the UC that he would call later that night when he obtained more heroin.

The second sale occurred later on March 9, when Rivers met the UC again on 14th Street West and sold the UC a powder substance containing heroin, carfentanil, methamphetamine, and furanyl fentanyl for $40.  Rivers was in the back seat of a silver car.

The third sale occurred on March 13, when Rivers met the UC on 9th Avenue East and sold the UC marijuana and a powder substance containing furanyl fentanyl for $100.  Rivers was in the front passenger seat of a dark SUV.

The final sale occurred on March 17, when Rivers met the UC on 13th Avenue East and sold the UC a powder substance containing heroin, fentanyl, and furanyl fentanyl for $100.

Relying on the PSI and conviction documents, the district court found that the drug sales were committed on different occasions and applied the ACCA enhancement.  The district court sentenced Rivers to 188 months' imprisonment, followed by five years of supervised release.[3]  Rivers timely appealed.

## V. STANDARDS OF REVIEW

We review the denial of a motion to suppress under a mixed standard, reviewing the district court's factual findings for clear error, construing the facts in the light most favorable to the prevailing party (here, the government), and its legal conclusions

---

[3] At the time of his arrest in this case, Rivers was on supervised release for his 2017 federal drug distribution convictions.  The district court also revoked Rivers's supervised release and sentenced Rivers to 12 months of imprisonment.  On appeal, Rivers does not challenge that sentence.

*de novo*. *United States v. Daniels*, 97 F.4th 800, 807 (11th Cir. 2024). We review *de novo* whether the facts set forth in an affidavit supporting a search warrant application constitute a sufficient basis for a finding of probable cause. *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011).

As to the ACCA, we review *de novo* whether prior offenses satisfy the different-occasions requirement. *United States v. Dudley*, 5 F.4th 1249, 1255 (11th Cir. 2021).

## VI. SUPPRESSION ISSUES

### A.    Firearm Found on Rivers

Rivers contends that the officers unlawfully entered the curtilage of his residence through the side driveway entrance and that his subsequent arrest and the discovery of the firearm were direct results of this illegal entry.[4]

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As such, the Fourth Amendment ordinarily requires that law enforcement obtain a warrant before conducting a search of a home. *United States v. Watts*, 329 F.3d 1282, 1284 (11th Cir. 2003).

One exception to the Fourth Amendment's guarantee is a "knock and talk" at a home, which allows a "police officer not

---

[4] In his motion to suppress, Rivers moved to suppress the firearm, the five spent shotgun shells in the firearm, and the cell phone. In this appeal however, Rivers focuses on only the firearm itself.

armed with a warrant [to] approach a home and knock, precisely because that is no more than any private citizen may do." *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (quotation marks omitted). The knock-and-talk exception is premised on the implicit license that all individuals, including police officers, have to "approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.*

We recognize, as some sister circuits have, that the Fourth Amendment does not strictly require officers to approach a home's front door where a back or side entrance is customarily used in the normal route of access. *See, e.g.*, *United States v. Shuck*, 713 F.3d 563, 568 (10th Cir. 2013); *United States v. Titemore*, 437 F.3d 251, 254, 259-60 (2d Cir. 2006); *United States v. Thomas*, 430 F.3d 274, 280 (6th Cir. 2005); *United States v. Reyes*, 283 F.3d 446, 467 (2d Cir. 2002); *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990). The implied license afforded to officers to conduct a knock-and-talk, however, can be revoked, but only by *express orders* from the person in possession of the home. *See United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006).

Here, the officers responded to a 9-1-1 call reporting that a man punched a boy in the face several times, breaking the boy's jaw, and that the incident occurred near a two-story house on 11th Avenue East. The only two-story house in that area was the Rivers residence, with which Officer Morningstar was familiar because he had worked in that neighborhood for more than a decade and had

responded to the two-story house for various reasons over the years. The officers went to the Rivers residence that night to locate any witnesses to the attack and to gather information. There was no evidence of pretense in their doing so. The officers' conduct falls squarely within the scope and purpose of the knock-and-talk exception. *See Jardines*, 569 U.S. at 8.

The officers' approach up the side driveway to the home's side entrance was also not unlawful. That side driveway was located on 11th Avenue East, a public roadway. Officer Morningstar and other officers customarily used the side driveway to approach the side door of this two-story house. While Rivers argues that the side door entrance was not the customary entrance, he points to no evidence contradicting Morningstar's testimony. *See United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004). Because the side driveway was a reasonable route of approach to this home, and nobody claims they strayed, Rivers has not shown that the officers' conduct exceeded the knock-and-talk exception.

Rivers also contends that the no trespassing signs in the front yard and on the tree by the side driveway constitute express orders revoking the implied license to enter to conduct a knock-and-talk. Rivers ignores that Officer Morningstar testified that he could not see the signs on the tree at night and that the side gate was open, all of which testimony the district court credited. *See United States v. Fernandez*, 58 F.3d 593, 596 (11th Cir. 1995).[5]

---

[5] Alternatively, even assuming *arguendo* that Rivers identified a defect in the officers' knock-and-talk conduct, we still would affirm the denial of the

On this record, we conclude that the district court properly denied Rivers's motion to suppress the firearm.

## B.    Shotgun Shell Found in the Rivers Residence

Rivers also challenges the denial of his motion to suppress the single spent shotgun shell found in his residence pursuant to a search warrant. He argues the search warrant affidavit failed to establish probable cause.

The Fourth Amendment requires that search warrants be supported by probable cause and describe with particularity the place to be searched and the items to be seized. U.S. Const. amend. IV. "Probable cause is 'not a high bar.'" *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). To establish probable cause to search a residence, the supporting affidavit must "establish[] a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *Id.* at 897-98 (alteration adopted). We give great deference to the judge's determination of probable cause. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).

---

suppression motion. The district court credited Officer Morningstar's testimony that Rivers pursued the officers and pushed Morningstar on the public roadway. The officers then arrested Rivers for battery, at which time they found the firearm on him. Rivers's arrest for battery is a clear intervening circumstance that interrupted the causal connection between the officers' purportedly illegal entry and the possibly tainted evidence discovered upon Rivers's arrest. *See United States v. Smith*, 688 F.3d 730, 741 (11th Cir. 2012).

Here, Detective Pieper's affidavit amply established probable cause to support the issuance of the search warrant. The affidavit set forth Detective Pieper's training and experience in street crime and gang-related investigations, his belief that Rivers lived at the residence, Rivers's felon status and prior convictions for selling drugs, and the details of Rivers's arrest and his illegal possession of a firearm at the residence. In doing so, the affidavit adequately connected Rivers and the residence and provided a plausible link between the residence and the illegal possession of the firearm. The affidavit also explained that, based on Detective Pieper's experience, he expected firearm accoutrements like ammunition to be present in the residence because the firearm found on Rivers would be of little use to him without ammunition. *See United States v. Albury*, 782 F.3d 1285, 1292 (11th Cir. 2015). The district court thus properly denied Rivers's motion to suppress the one spent shotgun shell found in Rivers's residence.

## VII. RIVERS'S SENTENCE

### A.    The ACCA

The ACCA imposes a mandatory minimum sentence of 15 years of imprisonment for defendants who violate 18 U.S.C. § 922(g) after being convicted of three prior violent felonies or serious drug offenses "committed on occasions different from one another." 18 U.S.C. § 924(e)(1). In turn, the Sentencing Guidelines provide that "[a] defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an armed career

criminal" and subject to enhanced offense levels.    U.S.S.G. § 4B1.4(a), (b).

There is no dispute that (1) Rivers's prior drug convictions qualify as "serious drug offenses" under the ACCA and (2) the ACCA enhanced his offense level and mandatory minimum sentence.  Rather, this appeal involves only the phrase "committed on occasions different from one another," which the Supreme Court addressed in *Erlinger v. United States*, 602 U.S. 821 (2024).

**B.    *Erlinger v. United States***

First, the Supreme Court held in *Erlinger* that judicial factfinding by a preponderance of the evidence that a defendant has three ACCA predicate convictions committed on different occasions violates the Fifth Amendment's guarantee of due process of law and the Sixth Amendment's guarantee to a jury trial. *Erlinger*, 602 U.S. at 830, 833, 835.  The Supreme Court further held that this finding must be made by a jury beyond a reasonable doubt or freely admitted by the defendant in a guilty plea.  *See id.* at 833-35.

The Supreme Court also explained that its decision was "on all fours with *Apprendi* and *Alleyne*," which together prohibited judges from "increas[ing] the prescribed range of penalties to which a criminal defendant is exposed" based on judicial factfinding by a preponderance of the evidence.  *Id.* (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)); *see Alleyne v. United States*, 570 U.S. 99, 111-13 (2013).  The *Erlinger* Court vacated the defendant's enhanced sentence and remanded because the district court, not a

jury, found that the defendant's prior burglary offenses were committed on different occasions. *Erlinger*, 602 U.S. at 827, 849.

Similarly, in this case, *Erlinger* error occurred because the district court, not a jury, found that Rivers's prior drug offenses were committed on different occasions. We, however, must still examine whether the *Erlinger* error was structural or subject to harmless-error review.

## C.   Harmless versus Structural Error

Unless an error is structural, it is subject to harmless error analysis. *Washington v. Recuenco*, 548 U.S. 212, 218-19 (2006). We reject Rivers's suggestion that *Erlinger* error is structural. Rather, we hold, as all our sister circuits to address the issue have, that we review *Erlinger* errors for harmlessness. *See United States v. Butler*, 122 F.4th 584, 589 (5th Cir. 2024); *United States v. Campbell*, 122 F.4th 624, 631 (6th Cir. 2024); *United States v. Johnson*, 114 F.4th 913, 917 (7th Cir. 2024).

Even though the *Erlinger* majority did not discuss harmless error, two justices separately suggested that in their views harmless error review was appropriate. *See Erlinger*, 602 U.S. at 849-50 (Roberts, C.J., concurring) ("[V]iolations of that right are subject to harmless error review."); *id.* at 859 (Kavanaugh, J., dissenting) ("[T]he relevant appellate court can apply harmless-error analysis."). That view is consistent with the Supreme Court's previous rulings that errors that "infringe upon the jury's factfinding role" are "subject to harmless-error analysis." *Neder v. United States*, 527 U.S. 1, 18 (1999); *Recuenco*, 548 U.S. at 222

(explaining harmless-error analysis applies to the "[f]ailure to submit a sentencing factor to the jury").

Just like the errors in *Apprendi* and *Alleyene*, *Erlinger* error is not structural because it does not render the defendant's trial "fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder*, 527 U.S. at 9. It is not the sort of error that destabilizes the defendant's entire trial on a fundamental level, as violations of basic rights to counsel, an impartial trial judge, or a public trial would. *See Johnson v. United States*, 520 U.S. 461, 468-69 (1997); *see also Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017).

That said, the fact remains that on harmless-error review, the government bears the burden of showing beyond a reasonable doubt that a rational jury would have found that the defendant's prior drug offenses all were "committed on occasions different from one another." 18 U.S.C. § 924(e); *Neder*, 527 U.S. at 18; *Dudley*, 5 F.4th at 1259. Our final task is thus to determine whether the government has met that burden on this particular record.

## D.    "Occasions Different from One Another"

Construing § 924(e)'s text, the Supreme Court has explained that "occasion" ordinarily means "an event or episode—which may, in common usage, include temporally discrete offenses." *Wooden v. United States*, 595 U.S. 360, 367 (2022). "[N]o particular lapse of time or distance *automatically* separates a single occasion from distinct ones." *Erlinger*, 602 U.S. at 841 (emphasis added) (citing *Wooden*, 595 U.S. at 369-70). Rather, the different-occasions issue requires a "multi-factored" inquiry under which a "range of

circumstances may be relevant to identifying episodes of criminal activity." *Wooden*, 595 U.S. at 369.

In the same vein, the *Erlinger* Court explained that "deciding whether . . . past offenses occurred on three or more different occasions is a fact-laden task," which asks these questions:

> Were the crimes "committed close in time"? How about the "[p]roximity" of their "location[s]"? Were the offenses "similar or intertwined" in purpose and character? All these questions, *Wooden* observed, "may be relevant" to determining whether the offenses were committed on one occasion or separate ones—and all require facts to be found before ACCA's more punitive mandatory minimum sentence may be lawfully deployed.

*Erlinger*, 602 U.S. at 834 (quoting *Wooden*, 595 U.S. at 369) (internal citations omitted).

Further, we note what the Supreme Court said about the *Erlinger* defendant's four prior burglaries, which were committed at different stores and restaurants over the span of eight days. *Id.* at 826, 835. In vacating Erlinger's enhanced sentence and remanding to the Seventh Circuit, the Supreme Court explained that it was not clear whether the jury in Erlinger's case would have decided that his prior burglaries occurred on different occasions, stating:

> Presented with evidence about the <u>times, locations, purpose, and character</u> of [Erlinger's] crimes, a jury

*might* have concluded that some or all occurred on different occasions. Or it might *not* have done so. All we can say for certain is that the sentencing court erred in taking that decision from a jury of Mr. Erlinger's peers.

*Id.* at 835 (emphasis added). Given the Supreme Court's guidance in *Wooden* and *Erlinger*, we now examine "the times, locations, purpose, and character" of Rivers's prior crimes. *Id.*

## E.  Analysis

<u>Time</u>.  All four of Rivers's prior drug offenses were committed within a relatively short span of eight days—(1) March 9, (2) March 9, (3) March 13, and (4) March 17. Although Rivers's offenses being committed on different days *could* be "a single factor" that "*can* decisively differentiate occasions," temporal separation of more than a day is not always dispositive. *Wooden*, 595 U.S. at 370 (emphasis added); *see also Erlinger*, 602 U.S. at 841.

<u>Location</u>.  The addresses of the March 9, 13, and 17 sales were different—14th Street West, 9th Avenue East, and 13th Avenue East—but still all sales occurred in the same neighborhood in Bradenton, Florida. The geographic proximity was close. In addition, the UC told Rivers where to meet him for the March 9 and 13 sales, which made these addresses different.

<u>Purpose and Character</u>.  All of Rivers's sales were not only all to the UC, but also all sales were for small drug and small cash amounts ($50, $40, $100, $100). To that extent, the character and purpose of the purchases are strikingly similar. The drugs,

however, were not identical—some contained heroin, others contained methamphetamine. Yet, all the drugs were Schedule I or Schedule II substances, and the powder substances sold on March 9, 13, and 17 all contained furanyl fentanyl with a mixture of other drugs.

On balance, given all these factors, a jury *might* reasonably conclude these sales were part of a single criminal episode orchestrated by the UC. On the other hand, a jury *might* find that at least three of these sales were committed on different occasions and were not part of one criminal episode. All we can say for certain is that this particular record does not establish that it is clear beyond a reasonable doubt that the jury would have found unanimously and beyond a reasonable doubt that Rivers's predicate offenses were committed on at least three separate occasions. Accordingly, the government has not carried its burden to prove that the *Erlinger* error was harmless beyond a reasonable doubt.

## VIII. CONCLUSION

We affirm Rivers's conviction, vacate his sentence, and remand for resentencing.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**