**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

_____

Nos. 18-3608 & 19-1653

_____


UNITED STATES OF AMERICA

v.

KAREEM MURPHY,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2-03-cr-00461-001)
(D.C. Criminal No. 2-18-cr-00176-001)
District Judge: Honorable Gerald J. Pappert (18-3608)
Honorable Harvey Bartle, III (19-1653)
_____

Submitted Under Third Circuit L.A.R. 34.1(a):

May 2, 2022

_____

Before: PORTER, MATEY, and PHIPPS,
*Circuit Judges*.

(Filed: November 4, 2025)

_____

OPINION*

_____

PORTER, *Circuit Judge*.

Kareem Murphy's supervised release was suspended in 2018 after a firearm-related incident at a family member's home. In these consolidated appeals, he contends that the evidence was insufficient to find that he committed a crime of violence and that the sentencing court insufficiently identified which statutes he violated. He also challenges his conviction as a felon in possession under the Armed Career Criminal Act (ACCA), arguing that hearsay evidence was used to convict him and that the District Court erred in finding his prior drug-trafficking offenses to be "serious drug offenses" under the statute. Finally, he argues that his trial counsel was ineffective for failing to request a bifurcated trial.

Murphy's challenges to his sentence and to his firearms charges are unavailing. We will affirm the suspension of his supervised release and his conviction. His ineffective-assistance-of-counsel claim is better addressed on collateral review.

I

On the night of February 18, 2018, Murphy was arrested in an alleyway behind a home owned by his wife's cousin, Nikara Carter, after a gunshot had been fired through

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

her front door. Murphy had been arguing with his sister-in-law, Henrietta Hatton, who was staying with Carter at the time. Carter reported that upon hearing the shot, she scrambled to get her three-year-old son to safety. As she did, she saw Murphy come through the front door and exit through the back door with "something black" tucked in his waistband. Conviction App. 122, 138. She believed it to be a gun.

Philadelphia Police Officer Ryan Brennan, parked in the neighborhood on a stationary patrol, heard the gunshot and moved toward the scene. As he did, he encountered a crowd gathered outside of the Carter home. Brennan tried to obtain information from the crowd, asking who fired the shot. Based on those conversations, he radioed that there would be "a male running through the alley with a blue shirt" and "the male should be Kareem Murphy." Conviction App. 467, 469. Even as Brennan radioed this information, Murphy was arrested in the alleyway behind Carter's home. He was serving a term of federal supervised release when arrested.

Three minutes passed between the gunshot and Murphy's arrest. Only two seconds elapsed between Brennan's naming Murphy over the radio and the report that Murphy had already been arrested. Another officer found a handgun on the path between the Carter house and where Murphy was arrested. It was loaded with sixteen live rounds and a cartridge was jammed in the chamber. Ballistics confirmed that it was the handgun used to shoot the front door. Murphy's hands and inside the waistband of his pants were covered with gunshot residue.

Murphy challenges the revocation of his supervised release and his conviction as a felon in possession under ACCA.

3

II

The District Court that suspended Murphy's supervised release had subject matter jurisdiction pursuant to 18 U.S.C. § 3583(e) ("[m]odification of conditions or revocation" of supervised release).[1] It entered the revocation order on November 27, 2018. After a jury convicted Murphy of two counts—a violation of 18 U.S.C. § 922(g)(1) for being a felon in knowing possession of a firearm and a violation of 18 U.S.C. § 922(q)(2)(A) for the impermissible possession of firearm in a school zone—the District Court,[2] on March 14, 2019, sentenced Murphy to a prison term of 276 months. It arrived at that term by accounting for Murphy's criminal history, which included three prior convictions for drug possession with intent to distribute cocaine in violation of Pennsylvania law. In particular, for the § 922(g)(1) offense, the District Court considered those prior crimes, committed in 1999, 2000, and 2003, as serious drug offenses under ACCA, which triggered ACCA's fifteen-year mandatory minimum sentence. *See* 18 U.S.C. § 924(e)(1); *see also* 35 Pa. Stat. § 780-113(a)(30).[3] Then, going above that minimum, the District Court sentenced Murphy to 240 months in prison for that count. For the § 922(q)(2)(A) count, the District Court imposed a 36-month sentence to run consecutively.

---

[1] Judge Gerald J. Pappert presiding.

[2] Judge Harvey Bartle, III presiding.

[3] The criminal informations preceding Murphy's first two convictions charged him with possession of crack cocaine. Though the information from his third conviction was silent as to what kind of drug Murphy was dealing, the criminal complaint against him in that case alleged that he was arrested in possession of crack cocaine, as well.

The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. Murphy timely appealed the suspension of his supervised release as well as his conviction and sentence. We exercise appellate jurisdiction to review both orders pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Murphy's arguments are unpreserved, so we review both his challenges to the revocation of supervised release and his challenges to his sentence for plain error. *United States v. Dillon*, 725 F.3d 362, 365 (3d Cir. 2013) (*citing* Fed. R. Crim. P. 52(b)). Under that standard, we may reverse a district court's decision only where we conclude that (1) there was an error; (2) the error was plain—that is, clear or obvious; (3) the error affects substantial rights, which generally means that it must have been prejudicial; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 365 (quoting *United States v. Olano*, 507 U.S. 725, 732–36 (1993)).

## III

A.     The revocation of Murphy's supervised release was not plain error.

Murphy raises two challenges to the suspension of his supervised release. First, he contends that the evidence was insufficient to find that he committed a crime of violence. Second, he argues that the sentencing court failed to identify precisely which statutes he

violated when it concluded he committed a Grade A violation of supervised release. Both arguments fail.

1. The evidence was sufficient to support the court's finding the Murphy committed a crime of violence.

Murphy argues that the sentencing judge who revoked his supervised release improperly relied on the government's account of the evidence introduced against him at trial. "[T]he district court," he writes, "sentenced Mr. Murphy based on the disputed allegation that he had fired a gun through his sister-in-law's door," but "no evidence substantiating that account was offered in the revocation proceedings." Appellant Supervised Release Br. 10. "[A]ll the court had before it was the violation petition and the fact of Mr. Murphy's convictions for illegal gun possession," and "the violation petition was hearsay upon hearsay that cannot be found to preponderate over Mr. Murphy's denial." *Id.*

A "District Court [is] entitled to rely on the facts presented at the revocation hearing in analyzing the nature of [the defendant's] violation," *United States v. Carter*, 730 F.3d 187, 192 (3d Cir. 2013), and a sentencing judge's inquiry is "largely unlimited either as to the kind of information he may consider, or the source from which it may come," *United States v. Tucker*, 404 U.S. 443, 446 (1972). It is sufficient that "the facts upon which a judge bases a sentence . . . have sufficient indicia of reliability to support their probable accuracy." *United States v. Leekins*, 493 F.3d 143, 149 (3d Cir. 2007)

6

(cleaned up). Even hearsay may be admissible in release revocation proceedings. *Id.* at 149–50.

*Carter* represents the typical challenge on this issue. The defendant received a prison sentence followed by three years' supervised release. 730 F.3d at 189. The United States Probation Office filed petitions for revocation of that release after he later pleaded guilty to misdemeanors for endangering the welfare of a child, corruption of a minor, and access device fraud. *Id.* Based on the evidence adduced at his revocation hearing, including testimony by the minor victim's mother, the District Court concluded that his conduct was a crime of violence and sentenced him to 37 months' imprisonment. *Id.* at 190. Carter challenged the determination that his offense against the minor was a "forcible sexual offense." *Id.*

On appeal, we noted that the categorical approach does not apply in the revocation context "and district courts may consider a defendant's actual conduct in determining whether [he has] broken the law and thus the terms of [his] supervised release." *Id.* at 192. We also said "'there is no requirement of conviction or even indictment' to find that a defendant has violated supervised release by committing a crime." *Id.* (quoting *United States v. Poellnitz*, 372 F.3d 562, 566 (3d Cir. 2004)).

Given the "largely unlimited" discretion of what a district court may consider in a revocation hearing, the District Court did not err in proceeding by proffer at Murphy's hearing. *Tucker*, 404 U.S. at 446. Murphy merely makes a general insinuation of doubt as

to the truth of the charges against him. That does not satisfy the plain error standard of review.

2. The court properly identified the statutory offense committed.

Murphy next contends that the sentencing court failed to specify the offense that constitutes a Grade A violation of supervised release. This argument also fails.

A Grade A violation of supervised release may be found by identifying

> conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a); or (B) any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years[.]

U.S.S.G. § 7B1.1(a)(1).

Conduct meriting a supervised release revocation need not be conduct for which the defendant is convicted or even indicted. But when a court revokes supervised release for a "crime of violence," it still must identify the particular crime for which it holds the defendant responsible. *Carter*, 730 F.3d at 192. In *Carter*, we affirmed the district court's consideration of unindicted conduct, but we nonetheless deemed insufficient the revoking court's identification of Carter's "crime of violence." *Id.* "It is . . . not enough," we wrote, "to say that a defendant's actions were simply violent or forcible without pointing to a crime containing those same elements. This omission leaves us unable to review the Court's exercise of discretion." *Id.* at 193.

Murphy argues that at his supervised release hearing, "the court did not identify any state or federal offense it regarded to meet these definitions[.]" Appellant Supervised

8

Release Br. 8. He quotes a portion of the District Court's statements in which the court deemed Murphy's conduct "obviously … a Grade A violation" and referred to it as "conduct constituting a Federal, State or local offense punishable by a term of imprisonment exceeding one year … [and] a crime of violence." *Id.* at 9 (quoting Supervised Release App. 51). But that is incomplete: the District Court specifically pointed to 18 U.S.C. § 922(g)(1) and 924(e), an ACCA provision. Supervised Release App. 31.

U.S.S.G. § 7B1.1(a)(1)(A) and (a)(1)(B) are disjunctive. A defendant may commit a Grade A violation by engaging in "conduct constituting. . .a federal, state, or local offense punishable by a term of imprisonment exceeding one year that. . .is a crime of violence . . . [*or*] any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years." U.S.S.G. § 7B1.1(a)(1) (emphasis added). So a revoking court may base a revocation on either of those grounds as long as it sufficiently identifies the crime of violence or the offense punishable by a sufficient term of imprisonment. Murphy candidly acknowledges in his brief that "the court found that his conduct constituted a grade A violation of supervised release because it was both a crime of violence and an offense punishable by more than 20 years' imprisonment." Appellant Supervised Release Br. 8. The District Court also identified the particular statutory offenses punishable by more than 20 years' imprisonment. Supervised Release App. 45. That is sufficient to defeat Murphy's challenge.

B.      Murphy's trial and sentencing under ACCA survive plain error review.

Murphy's challenge to his firearms conviction consists of three parts. First, he argues that his conviction was based, in part, on hearsay evidence from an unidentified

bystander and that the admission of that evidence at trial prejudiced him. Next, he argues that the District Court erred by designating his past offenses as "serious drug offenses" under the ACCA. Third, he argues that his counsel was ineffective in failing to request a bifurcated trial. The first two arguments fail and the third is more appropriately brought on collateral review. As with the previous issue, his arguments here are unpreserved, so we review for plain error.

> 1. To the extent that Officer Brennan's statement relied on hearsay, any error was harmless because the evidence against Murphy was overwhelming.

Murphy notes that members of the crowd advised Officer Brennan that the suspect he was searching for was wearing a blue shirt. Another said the suspect's name was Kareem Murphy. Brennan radioed this information to his fellow officers, only to learn that Murphy was already arrested in the alley behind the house. Murphy challenges as hearsay that portion of the message which identified him by name.

The rule against hearsay bars out-of-court statements offered to prove the truth of the matter asserted therein. Fed. R. Evid. 802. On a closer set of facts where the issue was properly preserved, the admissibility of Brennan's statements might be a closer call. But on plain error review where the evidence against Murphy is overwhelming, we can assume without deciding that the statement of the unidentified declarant was inadmissible and find no plain error because the challenged testimony did not conceivably affect the outcome of his trial. *See United States v. Casoni*, 950 F.2d 893, 918 (3d Cir. 1991).

Murphy makes much of Officer Brennan's inability to identify the person or persons in the crowd who named him as the shooter. But given the timing of Murphy's

10

arrest and Officer Brennan's identification of his name, there is no reasonable inference that broadcasting Murphy's name even contributed to his arrest, much less his conviction. Murphy was arrested when witnesses reported seeing a man in a blue shirt go through the house and into the back alley and Murphy was wearing a blue shirt in the back alley. Add the familial connection with the Carter home's residents, the ballistic report, the handgun recovered, and the gunshot residue on Murphy's hands and inner waistband—all adduced at trial—and a reasonable jury could easily find him guilty. Given the overwhelming evidence against Murphy, "it is highly probable that the error did not contribute to the judgment," and plain error is unestablished. *Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976).

2. The District Court did not err in finding Murphy's prior convictions to be for "serious drug offenses" under ACCA.

Murphy next challenges the District Court's conclusion that his prior drug trafficking convictions for distributing crack cocaine constituted "serious drug offenses" under ACCA. Again, his argument fails.

a. 35 Pa. Stat. § 780-113(a)(30) does not prohibit the "dispensing" of controlled substances by a licensed professional.

Murphy argues that the Pennsylvania statute under which he was convicted, 35 Pa. Stat. § 780-113(a)(30), is overbroad as it would prohibit the "administering" and "dispensing" of controlled substances by licensed medical professionals and therefore, under the categorical approach, criminalize a broader range of behavior than the federal statute, 18 U.S.C. § 924(e)(2)(A)(ii). The relevant text of the Pennsylvania statute provides:

11

> (a) The following acts and the causing thereof within the
> Commonwealth are hereby prohibited:
>
> (30) Except as authorized by this act, the manufacture, delivery, or
> possession with intent to manufacture or deliver, a controlled
> substance by a person not registered under this act, or a practitioner
> not registered or licensed by the appropriate State board, or
> knowingly creating, delivering or possessing with intent to deliver, a
> counterfeit controlled substance.

§ 780-113(a)(30). In *United States v. Womack*, 55 F.4th 219 (3d Cir. 2022), we explained that § 780-113(a)(30) does not address the case of a licensed medical professional "administering" a controlled substance and is "therefore not broader than a 'controlled substance offense' in that regard under section 4B1.2 of the Guidelines." *Id.* at 239–40.

Applying *Womack*, we can say the same for "dispensing" here. The term "Dispensing" is not in the text of § 780-113(a)(30). The closest the statute comes to it is the term "delivery," which is defined in § 780-102(b) as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device, or cosmetic whether or not there is an agency relationship." But "dispense" is separately defined in that section as "to deliver a controlled substance, other drug or device to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, administering, packaging, labeling, or compounding necessary to prepare such item for that delivery." And another subsection, § 780-113(a)(14), specifically addresses the question of unlawful administration and dispensing of controlled substances by a licensed professional, prohibiting

> [t]he administration, dispensing, delivery, gift or prescription of any
> controlled substance by any practitioner or professional assistant
> under the practitioner's direction and supervision unless done (i) in

12

> good faith in the course of his professional practice; (ii) within the scope of the patient relationship; (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession.

§ 780-113(a)(14). Murphy would have us ignore the variation in these statutory terms in order to make them redundant. But we hold that § 780-113(a)(30) does not prohibit "dispensing" a controlled substance. So it is not broader than a "controlled substance offense" under § 4B1.2 of the Guidelines.

   b. Murphy's challenges to the ACCA mandatory minimum do not succeed.

In his supplemental briefing, Murphy raises two new challenges to ACCA's application to him. Under ACCA, any "person who violates section 922(g)" with three previous convictions for "a violent felony or a serious drug offense, or both" must be imprisoned "not less than fifteen years." 18 U.S.C. § 924(e)(1). Murphy argues, however, that his convictions for possession with intent to distribute cocaine under Pennsylvania law, *see* 35 Pa. Stat. § 780-113(a)(30), do not qualify as predicate "serious drug offense[s]," 18 U.S.C. § 924(e)(1), and that even if so, his Sixth Amendment rights were violated because the District Judge—not a jury—found that he committed the three serious drug offenses on separate occasions.

C.   The Challenge to the Predicate Offenses under the Categorical Approach

   Under ACCA, a state crime is a 'serious drug offense' if it meets two criteria. First, it must carry a maximum sentence of ten years or more. *See id.* § 924(e)(2)(A)(ii). Second, it must involve "manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" as defined by federal law, specifically

13

"section 102 of the Controlled Substances Act." *Id.*; *see also* 21 U.S.C. § 802(6) (defining 'controlled substances' by reference to the federal drug schedules). For a state drug offense to satisfy the second criterion, there must be no way to commit the offense that would not also be a "serious drug offense" under ACCA. 18 U.S.C. § 924(e)(1); *see Shular v. United States*, 589 U.S. 154, 160–61 (2020) (adopting the view that, under the categorical approach taken to determine ACCA predicate serious drug offenses, a court "should ask whether the state offense's elements necessarily entail one of the types of conduct identified in § 924(e)(2)(A)(ii)" (emphasis removed) (internal quotation marks and citation omitted)); *see also United States v. Henderson*, 841 F.3d 623, 629 (3d Cir. 2016) (explaining that, under the Pennsylvania controlled substances statute, "the specific type of drug used was an element of the offense[,] not a means of committing the offense"); *Singh v. Att'y Gen.*, 839 F.3d 273, 284 (3d Cir. 2016) (construing the Pennsylvania controlled substances statute such that "[e]ach offense includes an element distinctive of the other, *i.e.* the particular controlled substance" (alteration in original) (quoting *Commonwealth v. Swavely*, 554 A.2d 946, 949 (Pa. Super. Ct. 1989))); *United States v. Abbott*, 748 F.3d 154, 159 (3d Cir. 2014) (concluding that the modified categorical approach applies to ACCA predicate serious drug offense determinations).

Murphy contends that the second criterion is not satisfied for any of his three prior Pennsylvania convictions for possession with the intent to deliver cocaine. His argument is premised on an amendment to the federal schedule of controlled substances in 2015 that removed [$^{123}$I]ioflupane—a radioactive substance derived from cocaine and used as an active ingredient in a radiopharmaceutical drug—from the schedule because it

14

presented no significant risk of abuse. *See* 21 C.F.R. § 1308.12(b)(4)(ii) (Sept. 11, 2015) (excluding [$^{123}$I]ioflupane from Schedule II); Schedules of Controlled Substances: Removal of [$^{123}$I]Ioflupane From Schedule II of the Controlled Substances Act, 80 Fed. Reg. 54,715, 54,716 (Sept. 11, 2015) (explaining that [$^{123}$I]ioflupane is the active ingredient in a drug "for the indication of visualizing striatal DATs in the brains of adult patients with suspected Parkinsonian syndromes"); Schedules of Controlled Substances: Removal of [$^{123}$I]Ioflupane from Schedule II of the Controlled Substances Act, 80 Fed. Reg. 31,521, 32,523 (proposed June 3, 2015) (discussing "practical barriers" to ioflupane's abuse). Murphy reasons that, after the federal schedule was amended in 2015, there was no longer a categorical match between the Pennsylvania schedule for controlled substances, *see* 28 Pa. Code § 25.72(c)(1)(iv) (2015) (classifying cocaine and like substances as a Schedule II controlled substance), and the federal schedule, *see* 21 U.S.C. § 812(c) (2012); 21 C.F.R. § 1308.12(b)(4)(ii) (Sept. 29, 2017). Based on that difference in the two schedules on February 18, 2018, when he committed his federal offenses, Murphy asserts that there was not a categorical match and that without such a match, his state convictions do not qualify as predicate offenses under ACCA. 18 U.S.C. § 924(e)(1); *see also United States v. Brown*, 47 F.4th 147, 154–55 (3d Cir. 2022) (concluding that the categorical approach under ACCA should compare the federal and state drug offenses at the time the *federal* offense was committed), *aff'd on other grounds*, 602 U.S. 101 (2024).

He is correct in one sense: the removal of [$^{123}$I]ioflupane from the federal schedule of controlled substances coupled with its continued inclusion on Pennsylvania's schedule

15

means that there was not a categorical match between the two standards on the date of his federal offense. *See Brown*, 602 U.S. at 108 (recognizing in the context of categorical matching between a Florida drug statute and ACCA that after the federal government legalized [$^{123}$I]ioflupane in 2015, "the federal and Florida definitions were no longer a categorical match"). But his predicate offenses occurred in 1999, 2000, and 2003—before [$^{123}$I]ioflupane was removed from the federal schedule. And at the times of those predicate offenses, there was a categorical match between Pennsylvania's prohibition of cocaine and the federal schedule for controlled substances. *Compare* 21 C.F.R. § 1308.12(b)(4) (Nov. 17, 2000), *with* 28 Pa. Code § 25.72(c)(1)(iv) (2001). Moreover, in the precise context of the removal of [$^{123}$I]ioflupane from the federal schedule, the Supreme Court has made clear that the relevant date for purposes of categorical matching is the date that the predicate state offense was committed—not the date of the federal offense. *Brown*, 602 U.S. at 123 ("[W]e hold that a state drug conviction counts as an ACCA predicate if it involved a drug on the federal schedules at the time of that offense."). Thus, the removal of [$^{123}$I]ioflupane from the federal schedule in 2015 does not affect the categorical match between the federal and Pennsylvania offenses at the time of Murphy's cocaine offenses in 1999, 2000, and 2003.

D.     The Sixth Amendment Challenge

Murphy also brings an *Apprendi* challenge by arguing that his Sixth Amendment right to a jury trial was violated because in imposing the ACCA mandatory minimum, a judge, not a jury, determined that his prior serious drug offenses were committed on separate occasions. *See* 18 U.S.C. § 924(e)(1) (requiring that predicate offenses be

16

committed "on *occasions* different from one another" (emphasis added)). *See generally Apprendi v. New Jersey*, 530 U.S. 466 (2000). He relies on the Supreme Court's decision in *Wooden v. United States*, 595 U.S. 360 (2022), which set forth a fact-intensive inquiry for determining whether offenses were committed on different occasions. *Id.* at 369 (identifying the considerations relevant to the occasions inquiry as "[t]iming," "[p]roximity of location," and "character and relationship of the offenses"). From there, Murphy correctly argues that, as a question of fact, the determination of separate occasions must be made by a jury. *See Erlinger v. United States*, 602 U.S. 821, 835 (2024) (holding that the question of whether prior offenses occurred on different occasions was a factual inquiry to be decided by a jury).

Although Murphy has a winning legal argument, he came upon it late in the process, raising it for the first time in his supplemental appellate briefing. Even so, some Sixth Amendment challenges constitute structural error. *See*, *e.g.*, *Weaver v. Massachusetts*, 582 U.S. 286, 294–96 (2017) (recognizing the denial of the right to a public trial as a structural error). An *Apprendi* challenge to a judge as factfinder such as the one Murphy now brings, however, is not one of those recognized categories of structural error. *See United States v. Barbosa*, 271 F.3d 438, 460–61 (3d Cir. 2001); *see also Erlinger*, 602 U.S. at 850 (Roberts, C.J., concurring). So without having preserved his argument through a timely objection in the District Court, Murphy must meet the plain-error standard, which includes demonstrating prejudicial error—an error that affected the outcome of the proceedings. *See Olano*, 507 U.S. at 734.

Here, however, Murphy has not demonstrated such prejudice. His first two serious drug convictions occurred almost four months apart, one in December 1999, and the other in March 2000, and his third serious drug conviction occurred in 2003. Therefore, even though the occasions inquiry is fact-bound, it is unlikely that a jury would have found any of the drug offenses to have been committed on the same occasion. Consequently, the determination by a judge of that fact did not affect the outcome of the proceeding.

E.      Murphy's ineffective-assistance-of-counsel claim would be more suitably brought as a collateral challenge.

Finally, Murphy argues that his counsel was ineffective for failing to seek a bifurcated trial separating the February 2018 incident from his felon-in-possession charge. He argues that our precedent favors bifurcation of a § 922(g)(1) count when evidence of the defendant's prior felony conviction is inadmissible as to another count joined for trial. His says his counsel labored under a misapprehension of the relevant case law and, therefore, failed to offer adequate representation.

"[C]laims of ineffective assistance of counsel ordinarily are not cognizable on direct appeal." *United States v. Givan*, 320 F.3d 452, 464 (3d Cir. 2003). "The better-reasoned approach," the Supreme Court explained in *Massaro v. United States*, "is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255." 538 U.S. 500, 504 (2003). "[I]n most cases," it wrote, "a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance," as the trial record to which an appellate court is bound was not

developed "precisely for the object of litigating or preserving the claim," leaving it "often incomplete or inadequate for this purpose." *Id.* at 504–05. As a result, we have held that "we may address the claim of ineffective assistance of counsel on direct appeal when the record is sufficient to allow determination of the issue" but have denied such claims without prejudice where it was not. *United States v. Thornton*, 327 F.3d 268, 271 (3d Cir. 2003).

For the record to be sufficiently developed to find ineffective assistance on direct appeal, it should be clear from the record alone that under *Strickland v. Washington*, counsel's conduct was deficient and that the deficiency resulted in prejudice to the defense. 466 U.S. 668 (1984). In *United States v. Headley*, we determined that defense counsel's "notice that it might have been fruitful to seek a downward adjustment" in a defendant's sentence based on the defendant's "minimal or minor role in [an] offense" demonstrated ineffective assistance, as there was "no rational basis" for finding the choice not to pursue a lesser sentence to have been strategic, and the loss of an opportunity to have the court consider that argument was prejudice. 923 F.2d 1079, 1084 (3d Cir. 1991).

In contrast to *Headley*, debatable ineffectiveness cases are dismissed to be raised again on collateral review. In *Givan*, where a defendant alleged ineffective assistance because his counsel advised him to plead guilty after miscalculating the guidelines range, we wrote that "even if we accept as true all of [defendant's] factual assertions," the record did not establish what, if any, prejudice resulted. 320 F.3d at 464–65. "[F]or all we know," we wrote, the defendant "might have gone to trial regardless of the calculations

supplied." *Id.* at 465. Similarly, in *Thornton*, a defendant facing felon-in-possession charges argued that his counsel was ineffective for failing to redact a police report showing his prior offenses involved firearms as well. 327 F.3d at 270–71. Again, relying heavily on *Massaro*'s reasoning, we wrote that "the issue of prejudice is . . . best decided in the first instance in a collateral action" and denied it without prejudice to be brought collaterally. *Id.* at 272.

We will follow the general rule and dismiss Murphy's claim without prejudice.

\* \* \*

We will affirm. Murphy's ineffective-assistance-of-counsel claim is preserved and may be asserted as a collateral challenge.